IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANETTE M. WILKEN,

                Plaintiff,                        CV-06-195-ST

      v.                                 FINDINGS AND
                                          RECOMMENDATIONS

CASCADIA BEHAVIORAL HEALTHCARE,
INC.,

                Defendant.

STEWART, Magistrate Judge:

**<u>INTRODUCTION</u>**

On January 3, 2007, Janette Wilken ("Wilken"), filed an Amended Complaint against her

former employer, Cascadia Behavioral Healthcare ("Cascadia"), alleging claims for: gender

discrimination and harassment in violation of Title VII ("First Claim") and ORS 659A.030

("Second Claim"); retaliation in violation of Title VII ("Third Claim") and ORS 659A.030

("Fourth Claim"); unlawful discrimination under Portland City Code 23.01.050 ("Fifth Claim");

common law wrongful discharge ("Sixth Claim"); federal wage claim for violation of the Fair

1 - FINDINGS AND RECOMMENDATIONS

Labor Standards Act, 29 USC §§ 206-216 and Oregon wage claim for violation of the Oregon

Wage and Hour Laws, ORS 653.261 ("Seventh Claim"); breach of employment contract

("Eighth Claim"); intentional infliction of emotional distress ("IIED") ("Ninth Claim"); and

negligent supervision ("Tenth Claim").

This court has subject matter jurisdiction pursuant to Title VII of the Civil Rights Act, 42

USC § 2000e-5, and the Fair Labor Standards Act, 29 USC § 216(b), and supplemental

jurisdiction over the state law claims under 28 USC § 1367.

Wilken has agreed to voluntarily dismiss her Eighth and Tenth Claims. Therefore, these

claims should be dismissed with prejudice.

Wilken has filed a Partial Motion for Summary Judgment (docket # 70) on her Seventh

Claim, and Cascadia has filed a Partial Motion for Summary Judgment (docket # 73) against all

of Wilken's remaining claims, with the exception of the Seventh Claim. For the following

reasons, both motions should be granted in part and denied in part.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law." The moving

party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986). Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

      The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party."  *Id* (citation omitted).

## UNDISPUTED FACTS

**I.**      **Cascadia's Organizational Scheme and Wilken's Position**

      Cascadia was formed in 2002 to provide services to individuals with mental health or

addiction problems, including residential, case management, direct mental health care, and crisis

intervention services.  Timme Declaration in Support of Defendant's Motion for Summary

Judgment ("Timme Decl") (docket # 77), ¶ 4.  In July 2002, Cascadia purchased the assets of

Unity, Inc. ("Unity").  Timme Declaration in Support of Defendant's Response to Plaintiff's

Motion for Summary Judgment ("Timme Response Decl") (docket # 92), ¶ 3.  Each of the

originating agencies had unique job positions and responsibilities for their employees.  *Id*.  As

part of the restructuring that began in July 2002, Cascadia blended or separated these positions to

create new positions specific to the newly formed entity.  *Id*.

      Wilken started working for Unity in May 1998 as an exempt salaried employee with

management responsibilities.  *Id* at ¶ 5.  At Unity, she performed some tasks of the position

Cascadia calls the Asset Manager and some of the Occupational Specialist.  *Id*.  Wilken became

employed with Cascadia in June 2002.  Wilken Declaration in Support of Plaintiff's Motion for

Partial Summary Judgment ("Wilken Decl") (docket # 71), ¶ 2.  She worked within the Housing

Department, which helps operate 55 buildings and at the time was managed by Neal Beroz

("Beroz"), vice president of housing.  Beroz Depo, pp. 9-10.  Among others, Beroz supervised

Juli Garvey ("Garvey"), director of asset management in the Housing Department.  *Id* at 10.

Reporting to Garvey are three asset managers, two occupancy specialists, a development

assistant, and a maintenance manager.  *Id*.  Cascadia has over 100 employees who work in

clinical and housing sites in Multnomah, Washington, and Marion counties, as well as in

Cascadia's Administration building.  Timme Decl., ¶ 5.  The Administration building is located

in downtown Portland and includes the Housing, Billing, Accounting, and Human Resources

Departments, as well as the Executive offices.  *Id* at ¶ 3.

　　　　Prior to March 1, 2003, Wilken was employed as an Asset Manager, had duties

supervising other employees, and was supervised by Garvey.  Garvey Depo, pp. 6, 16, 22.  She

was an exempt employee and paid a salary.  Wilken Decl, ¶ 3.  Cascadia required exempt

employees to work 37.5 hours per week.  *Id* at ¶ 5; Garvey Depo, p. 32.  In February 2003,

Wilken asked Garvey whether she could change jobs to become an Occupancy Specialist.

Wilken Depo, pp. 36-37; Garvey Depo, pp. 17-18.

　　　　On and after March 1, 2003, Wilken's job title was changed to Occupancy Specialist and

her supervisory duties were eliminated.  Wilken Decl., ¶ 2.  Her new duties required her to be

involved in the pre-application process, pre-screening of potential applications, maintaining the

waiting list, recertifying tenants, maintaining tenant files, and processing the move-out tenants.

Garvey Depo, p. 21.  She was also responsible for compiling accurate tax credit files.  Wilken

4 - FINDINGS AND RECOMMENDATIONS

Depo, p. 138. At the time Cascadia changed Wilken's job title and duties, it did not change her

classification to that of a non-exempt employee. Wilken Decl., ¶ 3.

In late 2003, Cascadia hired Lon Southard ("Southard") to create a comprehensive

compensation program for all Cascadia employees. Timme Response Decl, ¶ 7. The pay equity

study took a year due to the high number of employees (800). *Id*. As part of his investigation in

creating the compensation program, Southard talked to the managers of different programs to

determine their various job duties, and concluded that about 70 positions at Cascadia, including

Wilken's, were misclassified. *Id*; Lively Declaration in Support of Response to Plaintiff's

Partial Motion for Summary Judgment ("Lively Response Decl") (docket # 93), Exhibit 1. On

November 29, 2004, Cascadia determined that Wilken's position was non-exempt. Timme

Depo, pp. 165-66; Brischetto Affidavit in Support of [Plaintiff's] Motion for Partial Summary

Judgment ("Brischetto Aff") (docket # 71), Exhibit H. In June 2005, Cascadia processed a status

change notice documenting the misclassification and formally changing Wilken's job title from

"Program Supervisor" to "Occupancy Specialist" effective May 1, 2005. Timme Depo, p. 163;

Brischetto Aff, Exhibit G. On July 21, 2005, Cascadia processed a status change notice formally

changing Wilken's position from exempt to non-exempt effective July 1, 2005. Timme Depo, p.

166; Brischetto Aff, Exhibit I. Non-exempt employees were required to work 40 hours a week.

Garvey Depo, p. 32.

## II.    **The Nature of Cascadia's Working Files**

Based on the services it provides, Cascadia is a "covered entity" pursuant to the Health

Insurance Portability and Accountability Act ("HIPAA"). 45 CFR § 160.103. Because

individuals are not eligible for housing with Cascadia unless they suffer from a disability or

addiction, all tenant files contain some medical information which, at the very least, is a notation that the client suffers from a disability. Garvey Depo, p. 133; Wilken Depo, p. 45. Consequently, tenant files contain "protected health information" pursuant to HIPAA. 45 CFR § 164.501; Thomas Depo, p. 77; Beroz Depo, p. 29; Garvey Depo, pp. 133-34. Depending upon an employee's position with Cascadia, he or she may or may not have access to all types of files. Timme Decl, ¶ 6; Wilken Depo, p. 50.

Certain residential buildings operated by Cascadia are eligible for tax credits. As a non-profit organization, however, Cascadia does not need the tax credits and may sell them to investors. Beroz Depo, pp. 23-24; Garvey Depo, p. 143. Tax credit files are particularly important to Cascadia since the loss of these files would result in a significant financial loss to the organization. Beroz Depo, p. 21.

As an employee of Cascadia, Wilken received training on HIPAA and Cascadia's confidentiality policies in April 2002. Lively Decl in Support of Defendant's Motion for Summary Judgment ("Lively Decl") (docket # 78), Exhibit 32; Wilken Depo, p. 46. She also attended a training on tax credit certification in August 2005. Wilken Depo, p. 138; Lively Decl, Exhibits 11, 33. She was aware that the tax credit files contained confidential information, such as names, social security numbers, financial information, and whether or not the tenant suffered from a disability (if the building required it), and that Cascadia had policies to safeguard this confidential information. Wilken Depo, pp. 45, 138.

In March 2004, Cascadia hired another Occupancy Specialist, Patty Thomas ("Thomas"). Thomas Depo, pp. 6, 9. Garvey asked Wilken to train Thomas for the position because she recognized that Wilken was "the expert" in compliance monitoring. Garvey Depo, p. 126. The

two divided Cascadia's housing buildings between them, but Wilken's role at Cascadia with regard to the tax credit files was unique.  Wilken Depo, pp. 140-41, 143.  She was responsible for making sure the tax credit files, including Thomas's, were complete and compliant.  *Id* at 141.  Wilken's duties included auditing the work of other employees.  Garvey Depo, pp. 123-25.  As the senior person in the Occupancy Specialist position, Wilken was given discretion to decide on how to organize her files.  *Id* at 124.

III.    **Wilken's Sexual Orientation**

    When Wilken began working for Cascadia in July 2002, she was involved in a lesbian relationship with another female Cascadia employee, Becca Esplin ("Esplin").  Wilken Depo, pp. 21-22; Lively Decl, Exhibits 14, 34.  Garvey knew of Wilken's relationship with Esplin.  Wilken Depo, pp. 52-53; Garvey Depo, p. 35.  In August 2004, at Wilken's request, Garvey hired Esplin as an on-site manager at one of Cascadia's residential facilities.  Wilken Depo, pp. 55-56; Garvey Depo, pp. 35-36.

    In January 2005, Wilken began a relationship with her present partner and current Cascadia employee, Beverly Padilla ("Padilla").  Wilken Depo, pp. 58-59.  At the time, Padilla was a billing specialist in the Billing Department and was supervised by Audrey Woods ("Woods").  *Id*; Padilla Depo, p. 13.  Although both Billing and Housing are located in the Administration building, they are distinct departments.  Timme Decl., ¶ 3.  Garvey had no supervisory authority over Padilla.  Padilla Depo, p. 13.  Likewise, Padilla's supervisor, Woods, had no supervisory authority over Wilken.  Wilken Depo, p. 128.  Wilken's and Padilla's respective positions required extremely limited work-related contact of approximately once a month.  *Id* at 58-59.  Wilken told her supervisors and co-workers about her relationship with

Padilla when it began and they (Thomas, Sonya Kassen, Garvey, and Shawn Hebert) commented that they were happy for her. *Id* at 59-61; Kassen Depo, pp. 26-27; Garvey Depo, pp. 37-38; Thomas Depo, p. 86.

A number of Cascadia's employees in the Administration building are gay, including CEO Judy Watson and CFO Debra Humphrey-Keever. Humphrey-Keever Depo, pp. 23-24.

**IV.    Complaints Against Wilken**

In March 2005, Garvey received reports from Wilken's co-workers of physical contact (kissing, hugging, and holding hands) between Wilken and Padilla in and around the workplace. Garvey Depo, pp. 45-46, 50. Garvey met with Janet Timme ("Timme"), Cascadia's director of human resources, to discuss these reports and professionalism in the workplace. *Id* at 59. Timme informed Garvey that hugging and kissing between co-workers was not professional conduct. *Id* at 62.

On March 30, 2005, Garvey and Woods met with Wilken and Padilla to discuss their conduct in the workplace because their relationship was "making people uncomfortable." Wilken Depo, pp. 75-77. The supervisors provided no evidence or examples of what exactly had made people uncomfortable. *Id* at 79. According to Wilken, Garvey and Woods ordered her to limit her use of the copier in the Billing Department, limit her access to Padilla's cubicle, stand outside Padilla's cubicle and/or keep her hands visible at all times when she visited it. *Id* at 77-78, 93. According to Padilla, the following rules were imposed on Wilken and Padilla:

> [Wilken] can't go into the Billing Dept
> [Wilken] can't go into [Padilla's] cubicle
> [Wilken] must keep her hands visible at all times while taking to [Padilla]
> [Wilken] can't hide behind the 3" of wall in [Padilla's] cubicle

8 - FINDINGS AND RECOMMENDATIONS

> two people from two different departments can't be behind closed locked
> doors

Brischetto Affidavit in Opposition to Defendant's Motion for Summary Judgment ("Brischetto

Opp Aff") (docket # 88), Exhibit W, p. 1.

When asked about the purpose of the rules, Woods replied that people now knew they

were two women involved with each other in a close personal relationship and so she needed to

assure that others would not be offended or uncomfortable with the relationship.  Padilla Decl,

¶ 7.  Neither Garvey nor Woods made any derogatory comments about lesbians or women during

the meeting.  Wilken Depo, pp. 76, 78.

On March 31, 2005, Wilken and Padilla met with Timme to clarify Cascadia's

professionalism standards and because Wilken felt it was discriminatory to be singled out when a

heterosexual couple in the office, whom Wilken had seen hugging on the sidewalk in front of the

Administration building, did not have to "defend their relationship."  *Id* at 80-81; Timme Depo,

p. 59.  Timme told Wilken that "she would have a conversation with [Woods] about the rules

[Woods] was imposing."  Wilken Depo, pp. 85-86; Lively Decl, Exhibit 46.  Timme stated that

Woods's rules were not enforceable.  Wilken Depo, pp. 88-89.  During the meeting, no

derogatory comments were made about lesbians, women, or Wilken's relationship with Padilla.

*Id* at 87.

Timme planned to talk to Woods about the rules imposed "because [Woods] seemed to

be the one putting the rules in place."  Wilken Depo, p. 86;  Lively Decl, Exhibit 22.   Wilken

perceived that Woods and not Garvey was placing the restrictions on her.  Wilken Depo, p. 87.

Timme told Garvey that she felt Wilken knew Garvey was not trying to impose rules that were

9 - FINDINGS AND RECOMMENDATIONS

discriminatory, but was "something that was going on in the billing department."  Garvey Depo,

p. 78.

Despite Timme's intervention which altered the rules, Wilken felt that Woods continued

to impose "rules that specifically addressed [her] interaction in the Billing Department and were

still discriminatory."  Wilken Depo, p. 89.  One morning before work, Wilken and Padilla were

in the Billing Department discussing a personal matter.  Padilla Decl, ¶ 15.  They did not know

the door was locked.  *Id*.  Another employee tried to enter, but had no key and knocked on the

door which Padilla opened.  *Id*.  Subsequently, Woods met with Padilla and imposed a new rule

that Wilken and Padilla could not be in a closed, locked room together.  *Id*.  Padilla complained

to Timme who sent an email on April 15, 2005, to Woods and her supervisor, Kathy Zurfluh

("Zurfluh"), with a copy to Garvey, to clarify that "our message really needs to focus on

professional behavior and we cannot discriminately limit employee access."  Lively Decl,

Exhibit 45.  Padilla and Timme then met with Woods about this issue on April 20, 2005.  Padilla

Decl,

¶ 16.

Wilken observed that Garvey changed her method of supervision and began treating her

in an angry, hostile manner.  Wilken Decl, ¶ 10.

On July 19, 2005, Garvey wrote a memorandum to Wilken regulating her breaks.  Lively

Decl, Exhibit 25.  She noted it had been reported that Padilla was spending her break times in

Wilken's work area, even when Wilken was not there, which caused a distraction to other

employees due to the close proximity of each workstation, and imposed the following rules:

10 - FINDINGS AND RECOMMENDATIONS

> [I]f you will be spending your breaks with another employee and/or
> visitor, please do not do so at your work area.  Also, please advise
> [Padilla] and any other employee or visitor that may want to meet during
> your breaks, that they will not be able to spend this time in our
> department.

*Id*.

A week or two later, Garvey announced at a staff meeting that all Housing Department employees who wanted to spend their breaks or lunch with another person were required to do so away from their desks.  Wilken Depo, p. 124.

Also in July 2005, Garvey overheard Wilken and Thomas speaking in the hallway about the new visitor policy and told them to stop their conversation because "anybody could just walk in."  *Id* at 115.  Garvey did not speak to Wilken for the rest of the day and continued to ignore her for the next several days.  Wilken Decl, ¶ 21.  She then wrote Wilken a memorandum on keeping negative opinions and views of other employees to herself after hearing her speaking about another co-worker in a derogatory manner.  Garvey Depo, pp. 102-03; Lively Decl., Exhibit 24; Wilken Depo, pp. 115-16.  Wilken did not believe that Thomas was "written up" for the same conversation.  Wilken Depo, p. 118.  Wilken's job status or pay did not change as a result of this incident.  *Id* at 121.

At various times, Garvey received complaints from employees about other employees' physical contact.  Garvey Depo, p. 41.  When Kassen hugged a male coworker, Patrick Franks, she received a written warning from Garvey.  Garvey Depo, pp. 41-42, 45; Lively Decl, Exhibit 29.  Hebert did not receive a written warning, but was verbally warned when he patted Wilken on the back.  Garvey Depo, pp. 53-54.

///

11 - FINDINGS AND RECOMMENDATIONS

///

**V.**     **The Incident Involving Tax Credit Files**

On November 15, 2005, Wilken was home sick and asked Padilla to bring home a box

containing 16 original, unduplicated tax credit files so she could work on them from home.

Wilken Depo, pp. 143-44, 146; Padilla Depo, pp. 34-35.  The tax credit files were located in an

unlocked file cabinet.  Garvey Depo, p. 162-63.  Wilken neither asked permission nor informed

any member of management that she had asked Padilla to remove the tax credit files from the

office.  Wilken Depo, p. 146.  During the time that the files were out of the office, Thomas called

Wilken to request the emergency contact information from a tax credit file of a deceased client.

*Id* at 147.  Because Wilken was not home, she called Padilla and had her locate the specific tax

credit file and provide the emergency contact information in the file.  *Id* at 148.

Garvey reported the situation to Beroz and told him she believed that Wilken's removal

of the files warranted a written warning.  Garvey Depo, p. 152; Beroz Depo, pp. 28-29, 34.

Beroz believed that removing confidential, unduplicated tax credit files was "extraordinarily bad

judgment" with potential significant financial loss to the company and warranted termination,

rather than a simple write-up.  Beroz Depo, pp. 30, 33-34, 40-41, 52-53, 73-74.  The two talked

to Timme, who decided this warranted an investigation.  *Id* at 32-33.

Upon her return to the office on November 21, 2005, Wilken was summoned into a

meeting with Garvey and Alana Scott ("Scott"), an employee relations manager in the Human

Resources Department.  *Id* at 150; Scott Depo, p. 6.  Wilken testified that she could not recall

ever being told to ask permission before taking files out of the office.  Wilken Depo, p. 150.

Someone discussed how much money the company could lose if the tax credit files were lost, but

12 - FINDINGS AND RECOMMENDATIONS

Wilken did not believe anything was mentioned about confidentiality. *Id*. Wilken was placed on administrative leave and told that her conduct in removing the tax credit files could lead to her being terminated and that an investigation would take place. *Id* at 150-51. During the meeting, no derogatory comments were made about lesbians. *Id* at 152.

While Beroz had the responsibility of deciding whether Wilken would be terminated, he relied on the Human Resources investigation as to whether a violation of a Cascadia policy had occurred and whether it was a terminable offense. Beroz Depo, pp. 41-42. The investigation confirmed that Wilken was responsible for the tax credit files being removed from the office. *Id* at 40.

After learning the results of the investigation, Beroz terminated Wilken[1] the next day on November 22, 2005, based both on her lack of judgment in removing the tax credit files from the office despite training on their importance and irreplaceability, and on her breach of the requirement to keep certain information about housing tenants confidential. *Id* at 43, 51-53, 73.

At the time of her termination, Wilken had approximately 14 years of experience in the field. Garvey Depo, p. 126. Throughout the time she supervised Wilken, Garvey did not conduct performance evaluations of her in spite of Cascadia policies that required supervisors to do so because of Garvey's workload. *Id* at 122-23.

## **FINDINGS**

### I.    **Wage Claim (Seventh Claim)**

Wilken seeks partial summary judgment on her claims for minimum, regular, and overtime wages establishing that:

---

[1] Garvey believed that Human Resources made the decision to terminate Wilken. Garvey Depo, p. 181.

1.  Cascadia violated ORS 653.261, ORS 653.025, and the Fair Labor Standards Act ("FLSA"), 29 USC § 207, by failing to pay Wilken minimum, regular, and overtime wages for the period  she was misclassified as exempt from March 1, 2003, through June 30, 2005;

2.  The amount of $25,973.72 in regular and overtime wages is due to Wilken;

3.  Cascadia committed 28 separate minimum and overtime wage violations during the relevant period;

4.  The statute of limitations is two years for the state law claims under ORS 12.080(1)[2] and three years on the FLSA claims upon a finding of willfulness under 29 USC § 255;

5.  Wilken is entitled to penalties under ORS 653.055 for the 28 violations of ORS 653.261;

6.  In addition to the penalties under Oregon law, Wilken is entitled to penalties under 29 USC § 260 upon a showing of willfulness; and

7.  Wilken is entitled to the greater of prejudgment interest under the FLSA or Oregon law, or liquidated damages under the FLSA.

**A.    <u>Minimum Wage Under Oregon Law</u>**

Wilken alleges that she is entitled to payment under Oregon's minimum wage laws[3] for the extra 2.5 hours a week of regular wages which she allegedly worked during the time her position was misclassified.  Cascadia rejects this claim because it is inconsistent with the

---

[2]  In her reply, Wilken concedes that the statute of limitations for Oregon wage claims is two years under ORS 12.110(1) rather than six years under ORS 12.080(1).

[3]  Wilken is not bringing a claim for minimum wage violations under the FLSA.

language of Oregon's statutes and regulations, which must be interpreted consistently with the FLSA, and because Wilken admits that she was paid a salary for all hours worked.

Cascadia's last argument is not persuasive. Even if Cascadia is correct that Wilken admitted being paid a salary which compensated her for all hours worked, such an admission would not preclude her from bringing a claim that she was paid less than the minimum wage.

The parties' core disagreement is whether Oregon's minimum wage law follows FLSA's "workweek" method or the "hourly" method. A "workweek" method calculates the average hourly wage by dividing the amount paid in a workweek by the number of hours worked during that week. An "hourly" method awards an hourly wage less than the minimum wage for each individual hour worked, regardless of the average wage the employee was paid for the workweek.

Under the FMLA, "an employee must be compensated *for all hours worked*." 29 CFR § 778.223 (emphasis added). To measure compliance with this requirement, the FLSA expressly uses a "workweek" method. *See* 29 USC § 206(a) ("Every employer shall pay [minimum wages] to each of his employees who *in any workweek* is engaged in commerce or in the production of goods for commerce") (emphasis added).

Oregon's Bureau of Labor and Industries ("BOLI") is "guided" by the Code of Federal Regulations enforcing the FLSA *except* when prohibited by ORS Chapter 653 or BOLI regulations. OAR 839-020-0030(2)(b). ORS 653.025 provides:

> (1) Except as provided by ORS 652.020 and the rules of the Commissioner of [BOLI] issued under ORS 653.030 and 653.261, *for each hour of work time* that the employee is gainfully employed, no employer shall employ or agree to employ any employee at wages computed at a rate lower than: . . .
> (d) For calendar year 2003, $6.90.

15 - FINDINGS AND RECOMMENDATIONS

(e) For calendar years after 2003, rate adjusted for inflation.

(emphasis added).

Applying the "workweek" method and accepting Wilken's claim that she worked at most 55 hours per week, her hourly rate never fell below $11.83 (Wilken's lowest salary of $650.63 per week divided by 55 hours). Based on this calculation, Cascadia did not violate Oregon's minimum wage laws. However, applying the "hourly" method, Cascadia violated Oregon's minimum wage laws by not paying Wilken for 2.5 hours of work per week.

Wilken contends that by requiring payment "for each hour of work time," Oregon adopts the "hourly" method, rather than the FLSA's "workweek" method. However, Oregon's statutory language is similar to that found in the Code of Federal Regulations enforcing the FLSA which requires that the employee be compensated "for all hours worked." 29 CFR § 778.223. Since the FLSA has adopted a "workweek" method, interpreting ORS 653.025 as adopting an "hourly" method solely on the basis of its plain language would lead to interpreting 29 CFR § 778.223 as contrary to the FLSA. Therefore, the plain language of ORS 653.025 does not adopt the "hourly" method.

Beyond the plain language of ORS 653.025, one of BOLI's administrative regulations supports application of the "workweek" method:

> Employees *shall be paid no less than the applicable minimum wage for all hours worked*, which include "work time" as defined in ORS 653.010(12).[4] If in *any pay period the combined wages* of the employee are less than the applicable minimum wage, the employer shall pay, in addition to sums already earned, no less than the difference between the

---

[4] The definition of "work time" is now found at ORS 653.010(11), which provides that work time includes both time worked and time of authorized attendance.

amounts earned and the minimum wage as prescribed by the appropriate
statute or administrative rule.

OAR 839-020-0010(1) (emphasis added).

Wilken seeks to avoid application of this regulation by making two arguments.  First, she
contends that this regulation actually adopts the "hourly" model since it requires that employees
be paid "no less than the applicable minimum wage *for all hours worked*" and computes the
minimum wage as "prescribed by the appropriate statute or administrative rule." (emphasis
added).  However, the wording "for all hours worked" mimics the federal regulation and does
not expressly adopt the "hourly" method.  Furthermore, "the appropriate statute," ORS 653.025,
does not clearly prescribe an "hourly" method of measuring compliance with the minimum wage
requirements.  Requiring computation of the "combined wages" for a pay period closely
resembles the FLSA "workweek" method because it determines compliance with minimum wage
in relation to all the hours worked in a pay period, rather than separately for each hour.

Second, Wilken argued at the hearing that this court should disregard any BOLI
regulations regarding minimum wages, citing ORS 653.261(1)[5] which provides that:  "The
Commissioner of [BOLI] may issue rules prescribing such minimum conditions of employment,
*excluding minimum wages*, in any occupation as may be necessary for the preservation of the
health of employees . . ."  (emphasis added).  However, this statute does not prohibit BOLI from
adopting rules regarding minimum wages.  Instead, it only bars BOLI from issuing "rules

---

[5]  ORS 653.261 was recently amended by 2007 Oregon Laws Ch. 167 (SB 403).  For purposes of this summary
judgment motion, the court will only consider the version of the statute in effect from March 2003 to June 2005, the relevant
period for the minimum wage claim.

17 - FINDINGS AND RECOMMENDATIONS

prescribing . . . minimum wages."  Minimum wages are prescribed by ORS 653.025.  BOLI may still issue rules on how to interpret and apply ORS 653.025.

Trying another tack, Wilken points to BOLI's overtime regulations as being consistent with the "hourly" method.  For example, OAR 839-020-0030(3)(c) provides that employees on a fixed salary intended to compensate for a regular workweek of less than 40 hours are entitled to recover regular wages for each of the unpaid hours *up to* 40 hours per week (as well as one and a half times for each hour worked in excess of 40 hours per week).  Wilken urges that this right to recover regular wages for each unpaid hour up to 40 hours is consistent with the "hourly" method allegedly embraced by ORS 653.025.  However, any regulation dealing with the computation of overtime wages does not provide any guidance in determining how to apply the minimum wage law.

Wilken also relies on *Alvarez v. IBP Corp.*, 339 F3d 894 (9th Cir 2003), *aff'd on other grounds*, 546 US 21 (2005), to argue that Oregon, like Washington, adopts the "hourly" method.  In *Alvarez,* the Ninth Circuit held that a defendant's failure to pay any wages to workers for the time spent donning protective gear required for work violated Washington's minimum wage law.  Therefore, under *Alvarez*, a plaintiff establishes a minimum wage law violation through evidence that defendant failed to pay her the minimum wage for "each hour of work time."  *Id*, 339 F3d at 912.  *Alvarez* applies to this case only if it is similar to Washington law or if the factors the court used in interpreting Washington law can guide the interpretation of Oregon law.

The Ninth Circuit found persuasive the district court's conclusion that hourly employees have a right to a minimum wage per hour because: (1) the Washington Minimum Wage Act omits the phrase "in any workweek" which is contained in the relevant portion of FLSA; (2) the

18 - FINDINGS AND RECOMMENDATIONS

trial court had previously had used a per hour method, which was not criticized by the Supreme Court; and (3) it deferred to Washington's administrative agency, which employed the per hour standard for determining wage compliance for hourly employees, while expressly using the workweek standard for other types of employees (*e.g.* commissioned employees).  *Id*.

Attempting to draw a parallel, Wilken points out that ORS 653.025 also excludes reference to the "workweek" method and uses language clearly entitling employees to a minimum wage for "each hour of work time the employee is gainfully employed."  However, as discussed above, the plain language of ORS 653.025 does not necessarily lead to the conclusion that an "hourly" method should be employed.  Moreover, unlike Washington, Oregon's corresponding regulation, OAR 839-020-0010(1) contains the more general phrase "*in any pay period* [the combined wages are less than the minimum wage]."

*Alvarez* is also inapplicable because it involved plaintiffs who were hourly employees, not salaried employees, which are considered separate categories under Washington regulations, and Washington regulations actually allow a "workweek" method for determining minimum wage violations for salaried employees.

Unlike Washington law, no Oregon precedent favors Wilken's interpretation of ORS 653.025.  To the contrary, *Chard v. Beauty-N-Beast Salon*, 148 Or App 623, 631 & n9, 941 P2d 611, 615 & n9 (1997), applied FLSA's model to determine whether the Oregon minimum wage law was violated by requiring the plaintiff to present *prima facie* evidence of total hours worked and total compensation, and then dividing the latter by the former to measure compliance.  Admittedly, as Wilken contends, *Chard* mentions no disagreement between the parties on how to assess compliance with the minimum wage laws and simply adopted the FLSA method without

19 - FINDINGS AND RECOMMENDATIONS

discussion.  Even though the parties in *Chard* may have agreed that the federal minimum wage standard applied, the case provides a counterpoint to Wilken's position.

In summary, reading the plain language of ORS 653.025 as imposing an "hourly" method would require this court to interpret 29 CFR § 778.223 contrary to the FLSA "workweek" method.  Beyond the plain language of ORS 653.025, Wilken has offered no other persuasive reasons supporting the proposition that Oregon has adopted the "per hour" method.  *Alvarez* is inapplicable; OAR 839-020-0010(1) uses a "pay period" method of assessing compliance; and *Chard*, the one Oregon case cited by the parties, actually applies the FLSA method, albeit without meaningful discussion.  This court finds that a "pay period" method applies to calculate the minimum wage under Oregon law.  By dividing Wilken's pay period compensation by the highest number of hours she claims to have worked during a pay period, Wilken was never paid below the applicable hourly minimum wage.  Therefore, Wilken's motion for partial summary judgment as to violation of Oregon's minimum wage law should be denied.

## B.    <u>Regular Wages Under the FLSA and Oregon Law</u>

Next, Wilken contends that she was required to work 37.5 hours a week as a full-time employee, but worked 40 hours a week, and has a right to recover regular wages for the 2.5 extra hours she worked.  Cascadia responds that:  (1) Wilken has admitted to being paid a salary for all hours worked; (2) there was no agreement that she would work exactly 37.5 hours per week and instead she worked a "fluctuating workweek;" and (3) even if there was such an agreement, there is a genuine issue of material fact as to whether Wilken indeed worked the extra 2.5 hours per week.

20 - FINDINGS AND RECOMMENDATIONS

Oregon law and the FLSA require employers to pay their employees for all hours worked.  Under the FLSA, "hours worked" include time during which an employee is "necessarily required to be on the employer's premises, on duty or at a prescribed work place." 29 CFR § 785.7.  Under Oregon law, "hours worked" include "all hours for which an employee is employed by and required to give to the employer and includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place and all time the employee is suffered or permitted to work."  OAR 839-020-0004(20).[6]

### 1.    <u>Wilken's Alleged Admission</u>

First, Cascadia contends that Wilken has admitted that she was paid a salary for all hours worked, citing the following deposition testimony:

> Q.  [H]ow were your hours unpaid, then, if you were a salaried employee?
> A.  Because I was working way more hours than any human should work.
> Q.  But you were paid a salary for those hours at that time, correct?
> A.  Yes.

Wilken Depo, pp. 159-60.

However, Wilken was not asked if her salary compensated for all hours worked or if her salary was intended to compensate her for all hours worked.  Wilken Decl., ¶ 26.  She also informed her employer in writing that she was a "37.5 hr/wk" employee who had worked more than 45 hours per week and the excess hours were "unpaid hours."  Wilken Depo, Exhibit 16. Wilken also testified during her deposition that she is owed regular wages worked above 37.5

---

[6]  Paid time off ("PTO") is not included in the calculation of hours worked.  Lively Response Decl., Exhibit 13, p. 2.

hours (*id* at 178) and that she went from a "37.5 hour a week salaried employee" who was working more than 45 hours a week to a 40-hour week hourly employee (*id* at 160). In light of this evidence, Wilken's deposition excerpt cannot be interpreted as an admission that she was fully compensated for all hours worked.

### 2.    **Fluctuating Workweek**

Second, Cascadia contends that the parties had a clear mutual understanding that Wilken would be paid a fixed salary for a "fluctuating workweek." A fluctuating workweek refers to an understanding between the employer and the employee that the employee "will receive a fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many." 29 CFR § 778.114(a).[7] A fluctuating workweek applies when four requirements are met: (1) the employee's hours must fluctuate from week to week; (2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums); (3) the fixed amount must be sufficient to provide compensation every week at a regular rate of pay that is at least equal to the minimum wage; and (4) the employer and employee must share a "clear mutual understanding" that the fixed salary is intended to compensate the employee for all hours worked no matter how many or how few. *O'Brien v. Town of Agawam*, 350 F3d 279, 288 (1st Cir 2003), citing 29 CFR § 778.114(a), (c). The Ninth Circuit also requires proof of a mutual "clear understanding" for an employer to use the fluctuating workweek method. *Oliver v Mercy Med. Ctr., Inc.*, 695 F2d 379, 381 (9th Cir

---

[7] The Department of Labor recognizes three methods for calculating the regular rate of pay for salaried employees who are not exempt from overtime law requirements, one being the "fluctuating workweek" method. 29 USC § 207(a). The other two methods are the "fixed salary" method which governs employees who receive a fixed salary that is intended to compensate for a specific number of hours of labor (29 CFR § 778.113(a)) and the "variable workweek" method, which applies when an employee receives a fixed salary for a workweek up to a certain maximum number of hours (29 CFR § 778.323).

1982) (finding there was insufficient evidence that the fixed salary was intended to compensate the plaintiff for all hours worked).

The parties agree that the first three elements are satisfied here, but disagree as to whether they had a clear mutual understanding that a fluctuating workweek method would be used to compute Wilken's compensation.

Wilken argues that a "clear understanding" generally requires proof of an express agreement upon the fluctuating workweek method, citing cases outside this jurisdiction. *See Griffin v. Wake Co.*, 142 F3d 712, 716 (4th Cir 1998) (the employer provided an explanatory memorandum that twice indicated that weekly base salary reflects straight-time pay for whatever hours were worked and provided sample calculations of overtime under the plan); *Flood v. Hanover Co.*, 125 F3d 249, 252-253 (4th Cir 1997) (the employer gave each employee a memorandum "that clearly explained the fluctuating workweek payment method and that provided examples"); *Condo v. Sysco Corp.*, 1 F3d 599, 602 (7th Cir 1993), *cert denied*, 510 US 1110 (1994) (employment contract stated "[y]ou will receive half (½) the weekly hourly rate on all hours worked in excess of 40 per week");.

Cascadia admits that 37.5 hours per week was considered the equivalent of full time employment. Lively Response Decl, Exhibit 7, p. 12. It further acknowledges the absence of any written agreement that Wilken's fixed salary was intended to compensate her for a fluctuating workweek. Nevertheless, Cascadia argues that an agreement for a fluctuating workweek can be implied from the fact that Wilken understood she would receive a fixed salary and that she worked overtime hours for an extended period of time without payment of overtime. Wilken worked a varied schedule (*id*, Exhibit 16, pp. 3-10) and claimed that she was expected to

work hundreds of hours outside her normal work schedule to accomplish her job duties and that

she regularly worked 45 hours a week or more.  Even without an express acceptance of a new

agreement, "acceptance can be made by express words or by conduct." *Gen. Elec. Co. v. Porter*,

208 F2d 805, 813 (9th Cir 1953), *cert denied*, 347 US 951 (1954).  As further explained by the

Ninth Circuit:

> The men reported to work as ordered and worked pursuant to the new
> schedule. [The employer] discontinued paying the hourly wage with
> overtime and the employees continued to work on a monthly basis.  The
> firemen, no matter what may have motivated them in remaining at work,
> cannot now be heard to say that they did not acquiesce in the new
> arrangement.  We hold that as a matter of law the unilateral action of the
> employer was impliedly accepted by the firemen and that a new contract
> was created whereby the employees agreed to work on a two platoon
> system at a fixed monthly wage.

*Id* (citation omitted).

Under this acceptance by conduct test, Cascadia contends that Wilken acquiesced to a

fluctuating workweek by working fluctuating hours for which she received a fixed salary meant

to compensate for whatever number of hours she worked in any given week.

The problem with Cascadia's position is the lack of any evidence of a clear mutual

understanding.  Neither party has shown that Wilken would have been paid the same fixed

salary, without having to use sick leave or vacation hours, had she worked less than 37.5 hours.

In fact, Garvey refers to employees being "required at that point to work seven and a half hour

days." Garvey Depo, p. 32.  Moreover, Cascadia's position is at odds with its own employment

policy, which created two classes of employees:  full-time employees who must work 37.5 hours

per week and extended time employees who work more than 37.5 hours and are paid a special

hourly rate pursuant to a written agreement.  Wilken Decl., Exhibit A, p. 6.  Wilken was never

paid a special hourly rate as an extended time employee nor was she ever classified as anything

other than a full-time employee ("FTE 100") in Cascadia's employment documents.  Lively

Response Decl, Exhibits 5-7.[8]

 Cascadia relies on a number of cases in which the courts found an implied agreement for

a fluctuating workweek.  However, none of these cases involved a situation where the

employer's acts (failure to pay overtime) deviated from the employer's written policy.  In *Porter*,

208 F2d at 813, the employer instituted a new arrangement requiring more hours and paying the

employees the same fixed monthly salary.  That was held to constitute a new employment

contract for a fluctuating workweek method because the employees knew well in advance of the

change and accepted the contract by continuing to work under the new conditions.  In *Valerio v.

Putnam Assoc., Inc.*, 173 F3d 35, 39 (1st Cir 1999), the employee understood that the hours

would be "8:30 to whenever" and that the employer did not intend to provide overtime pay if she

worked more than 40 hours a week; there was no analysis of the employer's personnel policies.

In *Mayhew v. Wells*, 125 F3d 216, 218-19 (4th Cir 1997), the employee admitted that he was not

"docked" for weeks when he worked less nor paid more when he worked more than eight hours a

week, and the employer's comp time policy supported the conclusion that the employee would

receive only a fixed salary no matter how much or how little time he worked.  *Blackmon v.

Brookshire Grocery Co.*, 835 F2d 1135, 1138 (5th Cir 1988) lacked any analysis about why a

fluctuating workweek agreement existed.  In *Braddock v. Madison County, Inc.,* 34 F Supp 2d

1098, 1106 (SD Ind 1998), there was never any explicit or implicit promise and no contract to

---

  [8]  Wilken also argues that Cascadia's paid time off policy is inconsistent with the fluctuating workweek method because it establishes that one day of salary is the equivalent of 7.5 hours worked.  If a full-time exempt employee was expected to work a fluctuating workweek, the employee would have no regular rate of base pay since the employee's regular rate would change on a weekly basis.

25 - FINDINGS AND RECOMMENDATIONS

pay additional compensation beyond a fixed salary.  In *Zoltek v. Safelite Glass Corp.*, 884 F

Supp 283, 286-87 (ND Ill 1995) an employee misclassified as exempt often worked more than 40

hours a week, was never compensated for overtime, was never explicitly or implicitly promised

through a contract or otherwise that he would be paid additional compensation and never

protested this arrangement.

      In *Brigham v. Eugene Water & Elec. Bd.*, 357 F3d 931, 938 (9th Cir 2004), the Ninth

Circuit recognized the power of constructive agreements, relying on cases where the employer

informed the employees of new employment terms and the employees constructively accepted

those terms by continuing to work.  In contrast, Cascadia did not inform Wilken that it would not

follow its own written employee policy in how it compensated her.

      In conclusion, the record contains insufficient evidence of a clear mutual understanding

that Wilken would be paid a fixed salary no matter how few or many hours per week she

worked.  Instead, the parties' agreement was that Wilken would be paid a fixed salary for 37.5

hours of work per week.

### 3.    <u>Amount of Compensation</u>

      Under both Oregon law and the FLSA, salaried employees with a fixed workweek of

37.5 hours, but who work 40 hours, have a right to recover regular wages for the extra 2.5 hours

worked.  OAR 839-020-0030(3)(c) (salaried employees required to work a regular workweek of

less than 40 hours may recover regular wages for any additional hours worked up to 40 hours per

week);[9]  29 CFR § 778.113(a) ("if an employee is hired at a salary of $182.70 divided by 35

---

[9]  The regular hourly rate of pay is determined by dividing the salary by the number of hours agreed to be worked in that workweek.  OAR 839-020-0030(3)(c)(A).  If the agreed salary is for periods other than a workweek, then it must be reduced to its workweek equivalent and divided by the number of hours agreed to be worked in the workweek.

(continued...)

26 - FINDINGS AND RECOMMENDATIONS

hours, or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of

the first 40 hours. . .")  In other words, when the employee is hired at a salary for a fixed

workweek of less than 40 hours a week, she can recover a regular hourly rate of pay for up to 40

hours.  *See also* 29 CFR § 778.322.

Wilken has a claim for regular unpaid wages if she can show no genuine issue of material

fact that she indeed worked the extra 2.5 hours per week.  Cascadia argues that discrepancies as

to the number of hours worked raise a genuine issue of fact.  For example, Wilken claims she is

owed 7.5 hours of regular wages for the last week of February 2004 (week 8).  Plaintiff's

Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's

Memorandum"), Exhibit B, p. 1.  However, her answer to the First Set of Interrogatories states

that she worked 37.5 hours and took 7.5 hours of paid time off ("PTO").  Lively Response Decl,

Exhibit 14, pp. 2 and 16.  PTO is not included in the calculation of hours worked for purposes of

wage claims.  *Id*, Exhibit 13, p. 2; *Wheeler v. Hampton Township*, 399 F3d 238, 243-44 (3rd Cir

2005), citing 29 USC § 207(e)(2) (personal leave time is not included in the calculation of the

regular rate of pay).  Thus, Wilken has no claim for unpaid regular wages that week.  The record

reveals other instances where Wilken improperly included PTO in her calculation of 2.5 hours of

extra time worked.  *See* year 2003, weeks 9, 13-15, 19, 22-24, 26-29, 39, 40, 48, 52; year 2004,

weeks 1, 2, 19, 20, 22, 37, 48; year 2005, weeks 2, 4, 8, 9, 13, 19, 22, 23.  Lively Response Decl,

Exhibit 14.  Cascadia also contests the estimates in weeks 19, 22 and 23 in year 2005 for other

_____

[9](...continued)
OAR 839-020-0030(3)(g).

27 - FINDINGS AND RECOMMENDATIONS

reasons, as explained below.  These inconsistencies create a genuine issue of material fact as to whether Wilken's estimates are correct.

### C.    Overtime Wages Under the FLSA and Oregon Law

Next, Wilken claims that she often worked more than 40 hours per week for which she seeks overtime compensation.  Cascadia admits that Wilken is entitled to overtime compensation, but only as a fluctuating workweek employee (at 0.5 times rather than 1.5 times her regular rate) and only if she can prove that she worked overtime.  This court has found above that Wilken was an employee on a fixed salary for 37.5 hours a week, rather than a fluctuating workweek employee.  Thus, the remaining issue is whether she is entitled to any overtime wages.

The FLSA protects employees from, among other things, working overtime hours without compensation.  "Overtime" is generally defined as any employment in excess of 40 hours in a single work week.  29 USC § 207(a)(1).  Under OAR 839-020-0030(1), other than certain exceptions not relevant to this case, "all work performed in excess of forty (40) hours per week must be paid at the rate of not less than one and one-half times the regular rate of pay when computed without benefits of commissions, spiffs, bonuses, tips or similar benefits . . ."  The employee's rate of pay is determined by ". . . dividing the total remuneration for employment in any workweek [excluding bonuses, etc.] by the total number of hours actually worked in that workweek for which such remuneration was paid."  OAR 839-020-0030(2)(b).  OAR 839-020-0030(3)(g) requires that when a fixed salary is for a period longer than a week, the fixed salary must be reduced to a weekly salary before applying OAR 839-020-0030(2)(b).

Cascadia argues that numerous discrepancies in the number of alleged overtime hours prevent summary judgment, and, in any event, the statute of limitations limits her recovery under both the FLSA and Oregon law to the period from February 10, 2004, to June 30, 2005.

### 1.    Unpaid Overtime

An employee who seeks to recover unpaid overtime wages under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Brock v. Seto*, 790 F2d 1446, 1447-48 (9th Cir 1986), quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 US 680, 687 (1946). The burden of record-keeping is on the employer. 29 USC § 211(c). When an employer fails to keep adequate employment records, an employee may make a *prima facie* case of overtime violations if she produces "sufficient evidence to show the amount and extent of [her] work as a matter of just and reasonable inference." *Anderson*, 328 US at 687-88. Once the employee establishes a *prima facie* case, the burden then shifts back to the employer to rebut the number of hours alleged by presenting specific evidence disproving those hours. *Brock*, 790 F2d at 1448 (citation omitted).[10] A plaintiff is entitled to summary judgment based upon the employee's reasonable estimate of hours worked when there is no factual dispute that the employer failed to keep adequate records of time worked and the employer submits no other evidence negating the reasonable inference to be drawn from the employee's evidence.

Wilken has submitted an estimate of her hours worked during the relevant time period, including many weeks when she worked more than 40 hours. *See* Plaintiff's Memo, Exhibit B. Cascadia disputes the accuracy of Wilken's estimates and notes that Wilken did not record her hours when she was a salaried employee. Wilken Depo, pp. 176-77, 179. Nevertheless, Wilken

---

[10] Without discussion, the parties also apply the FLSA standard to the Oregon overtime claims.

contends that her estimates are reasonable and that Cascadia has offered no rebutting evidence to create a factual dispute regarding the reasonableness of the inference to be drawn from her estimates.

Cascadia has no records of the number of hours Wilken worked. Garvey could not recall whether Wilken did or did not work overtime during the relevant period. Garvey Depo, p. 24. Thomas, who shared an office with Wilken, stated that Wilken worked "really late," that she stayed to get her work done when Thomas left, and that she worked late off and on throughout the time Thomas worked with her. Thomas Depo, p. 52.

However, Cascadia has offered evidence showing some discrepancies between Wilken's estimate of her work hours and contemporaneous notes/emails during the limited time period of March 21 to June 30, 2005. For example, although Wilken claimed that she worked 45 hours during March 21-27, 2005, her personal organizer shows that she was off work on March 21, 23, and 25. Lively Response Decl, Exhibit 9, pp. 5-6. From March 21 to April 15, 2005, she claimed to have worked 45-50 hours a week, yet her personal organizer reflects that she was each off those Fridays. *Id* at 7. During the week of May 9, 2005, she claimed to have worked 55 hours, but was on vacation for 37.5 hours. For the week of June 6-12, 2005, she claimed to have worked 26 hours. However, on Tuesday, June 14, 2005, she responded to a work email sent to her on June 9, 2005, explaining that she "just got back today." *Id* at Exhibit 12. For the week of June 13-19, 2005, Wilken claims to have worked 50 hours, but the same June 14, 2005 email stated that she was not at work that Monday and would only be working half days that week. *Id*.

In response, Wilken notes that her estimates would have been more accurate had Cascadia actually produced her timesheets for March through June 2005 in response to her

discovery requests.  Cascadia produced all the timesheets for March 2003 through November 2005 *except* for March through June 2005.  Moreover, some of the time Wilken recorded as a scheduled vacation in May and June 2005 was initially approved and then cancelled, meaning that some of the time scheduled on her calendar as vacation was ultimately time worked.  Wilken Decl, ¶ 28.  After reviewing her calendar and mileage reimbursements, Wilken concedes that week 19 ( week of May 9, 2005) should be recorded as 37.5 hours of PTO rather than 55 hours worked and withdraws her overtime claim for that week.  She also asks that the total hours claimed for weeks 22 and 23 be switched, with week 22 as 19 PTO/26W and 23 as 37.5 PTO.  *Id* at ¶ 29.  With regard to the Fridays off during the period March 21-April 15, 2005, Wilken explains that her work schedule had been changed from 37.5 hours in five days to 37.5 hours in four days.  *Id* at ¶ 32.

Wilken conceded factual disputes with regard to weeks 22, 23, and 24 (May 30-June 19, 2005).  With respect to March 21-April 15, 2005, Wilken disclaims any factual disputes since her estimate was not challenged by the change in the number of days she worked.  As to week 12 (March 21-27, 2005), a factual dispute clearly exists because Wilken never explains how she managed to work 45 hours (excluding PTO) when she was off for three work days that week.  Weeks 14 and 15, with estimates of 45 hours a week even though Wilken did not work on Fridays, are certainly suspect, although it is possible to achieve that number of hours in four working days.

In sum, this court finds that these inconsistencies create an issue for the jury as to the amount of overtime.  Cascadia has offered examples that counter some of Wilken's estimates and attack her credibility.  Moreover, while Wilken believes she worked at least 45 hours per

week, she admits that she had no way to calculate with any reasonable degree of accuracy how many hours she worked in any given week.  *Id* at 182-83.

### 2.  <u>Statute of Limitations</u>

Should Wilken prevail on her overtime claims at trial, Cascadia contends that she can only recover overtime compensation from February 10, 2004, through June 30, 2005, which is the two year period prior to filing of her lawsuit on February 10, 2006.  Both the FLSA and Oregon law require that a claim for overtime compensation be commenced within two years after the cause of action accrued.  29 USC § 255(a) and ORS 12.110(3).

Wilken contends that the statute of limitations for the FLSA claim is three years because Cascadia's violations are "willful."  *See* 29 USC § 255.  Wilken admits that willfulness is a matter for the finder of fact.  Therefore, if the jury decides that Cascadia has committed a willful violation of the FLSA, then Wilken would be entitled to a three-year statute of limitations under the FLSA.  29 USC § 255(a).

Wilken concedes that the statute of limitations for the state wage claims is two years under ORS 12.110(3), rather than six years under ORS 12.080(1).  However, she disputes Cascadia's application of the statute, pointing to ORS 12.110(3) which controls the statute of limitations for both overtime pay and for wage penalties:  "An action for overtime or premium pay or for penalties or liquidated damages for failure to pay overtime or premium pay shall be commenced within two years."  As discussed below, this court concludes that a penalty does not become due until termination.  Wilken argues that if penalties are not due until termination, then overtime wages similarly are not due until termination and, as a result, all wages for overtime hours worked during her employment became due upon her termination.

However, this court rejects Wilken's assumption that overtime pay should be treated the same as penalties with respect to the statute of limitation. The recovery of penalties is governed by the language of ORS 652.150. In comparison, the failure to pay overtime "is a violation of Oregon's minimum employment conditions law and can occur during employment." *Cornier v. Tulacz*, 176 Or App 245, 249, 30 P3d 1210, 1212 (2001). If the employee is still employed and has not been paid for overtime, then her claim for overtime compensation accrues at the time of non-payment. She does not have to wait to be terminated to bring that claim. Because Wilken's cause of action for failure to pay overtime wages accrued each pay day when she was not paid such wages, the two year statute of limitations bars her claim for failure to pay overtime wages for the period March 1, 2003, through February 9, 2004.

### D.    Penalties for Overtime Wage Violations

#### 1.    State Law Penalties

Wilken seeks penalties under both ORS 652.140 (failure to pay wages due and owing upon termination) and ORS 653.261 (failure to pay "time and a half" for overtime). Complaint, ¶ 53. If an employer willfully fails to pay wages due upon termination under ORS 652.140, then it is liable for a penalty as provided in ORS 652.150. If an employer willfully fails to pay overtime wages under ORS 653.261, then ORS 653.055(1)(b) mandates payment of a penalty as provided by ORS 652.150.

Whether Wilken is entitled to recover penalties depends on whether Cascadia violated ORS 652.140 and ORS 653.261 and whether it did so willfully. Those issues are not before the court at this time and will be addressed, if necessary, in post-trial motions. The only issue presented by Wilken's summary judgment motion centers around the type of penalty Cascadia

33 - FINDINGS AND RECOMMENDATIONS

would have to pay if it is found liable under ORS 653.261. Wilken claims that she is entitled to

serial 30-day penalties for each instance when she was not paid overtime wages in violation of

ORS 653.261, amounting to 28 separate 30-day penalties corresponding to 28 pay periods.

Cascadia counters that even if Wilken is entitled to recover a penalty, she is only entitled to one

30-day penalty.

ORS 653.055 provides a private right of action for failure to pay overtime wages under

ORS 653.261:

> (1) Any employer who pays an employee less than the wages to which the
> employee is entitled under ORS 653.010 to 653.261 is liable to the
> employee affected:
> (a) For the full amount of the wages, less any amount actually paid to the
> employee by the employer; and
> (b) For civil penalties provided in ORS 652.150.

ORS 652.150(1) provides, in pertinent part:

> If an employer willfully fails to pay any wages or compensation of any
> employee *whose employment ceases* as provided in ORS 652.140 and
> 652.145, then, as a penalty for such non-payment, the wages or
> compensation of such employee shall continue from the due date thereof
> at the same hourly rate for 8 hours per day until paid or until action
> therefore is commenced. However, in no case shall such wages or
> compensation continue for more than 30 days from the due date.

(emphasis added).

Wilken contends that the "due date" in ORS 652.150(1) refers to the "regular payday, at

which date all employees shall be paid the wages due and owing to them." ORS 652.120.[11]

Therefore, Wilken concludes there are 28 different "due dates." However, the plain language of

---

[11] ORS 652.120 was amended by the 2007 Oregon Laws Ch. 453 (H.B. 2258). This is the unamended version which
was in effect at the relevant time.

ORS 652.150(1) clarifies that the penalty for failure to pay overtime wages does not accrue unless and until the "employment ceases."

Moreover, no Oregon case relied upon by Wilken actually endorses the stacking of penalties. *Cornier,* 176 Or App at 249, 30 P3d at 1212, held that a plaintiff is entitled to a 30-day penalty for an overtime violation (under ORS 653.261) and a separate 30-day penalty failing to pay vacation wages at termination (under ORS 652.140). In other words, *Cornier* allowed for separate penalties for "separate varieties of employer misconduct." *Id*. The failure to pay "time and a half" for overtime is a cause of action that accrues on the payment date regardless of whether the employee continues to work for the employer, while the failure to pay vacation wages due and owing upon termination *only* occurs if the employment relationship has ended. *Id*. Here, there is only one type of alleged employer misconduct, namely the failure to pay overtime wages. Contrary to Wilken's position, *Cornier* did not hold that the stacking of penalties for the same type of employer misconduct is allowed. Wilken also relies on *Mathis v. Housing Auth. of Umatilla County*, 242 F Supp 2d 777, 788 (D Or 2002), and *Pascoe v. Mentor Graphics Corp.*, 199 F Supp 2d 1034, 1062 (D Or 2001), for the proposition that Oregon law allows for the recovery of stacked penalties. However, neither case addressed the question of whether an employee could recover serial 30-day penalties for overtime violations of ORS 653.261. In *Young v. State of Oregon*, 340 Or 401, 133 P3d 915 (2006), the employees established a violation for the failure to pay overtime wages for a period of two years, yet the court made no mention of stacking penalties.

In conclusion, based on the plain language of ORS 652.150(1), the lack of multiples types of employer misconduct, and the absence of Oregon precedent, the court finds that if

35 - FINDINGS AND RECOMMENDATIONS

Cascadia is found liable for the failure to pay overtime wages under ORS 653.261, then it is liable for only one 30-day penalty.[12]

**2.    Liquidated Damages Under the FLSA and Prejudgment Interest Under the FLSA and Oregon Law**

Wilken seeks summary judgment establishing her right to recover liquidated damages under the FLSA in addition to penalties under state law.  An employer who violates the FLSA is ordinarily liable both for unpaid wages and an additional equal amount as liquidated damages. 29 USC § 216(b), *held unconstitutional on other grounds by Alden v. Maine*, 527 US 706 (1999). However, the court has discretion to award no liquidated damages or to reduce liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 USC § 260.

Cascadia demands that the court eliminate any liquidated damages that may be available to Wilken on the ground that its actions were not willful and that it made a good faith effort to comply with the FLSA.  However, the jury's findings on the issue of willfulness may influence the court's discretion in post-trial motions.  Therefore, Wilken's motion for summary judgment on this issue should be denied with leave to renew after trial.

Wilken also requests a finding that she is entitled to recover pre-judgment interest on either the federal or state law claims, whichever is greater, and that if liquidated damages are awarded under the FLSA, she is entitled to pre-judgment interest less any award of liquidated

---

[12]  As a result, this court need not address Cascadia's alternative argument that Wilken's interpretation of the statute as allowing serial penalties would violate its due process rights by being grossly disproportionate to the actual damages a finder of fact would award.

damages under the FLSA.  This court has previously addressed this issue and concluded that a

plaintiff may recover both a penalty under Oregon law for a willful violation and an award of

liquidated damages under the FLSA, but not both liquidated damages under the FLSA and

duplicative prejudgment interest under Oregon law.  *Mathis*, 242 F Supp at 789-90.  Thus, if if

the jury found Cascadia liable, Wilken would be entitled to prejudgment interest under either the

FLSA or Oregon law, whichever is greater, less the amount of liquidated damages (if any)

awarded under the FLSA.

## II.     Title VII Gender Discrimination Under 42 USC § 2000e-2 (a) (First Claim)

Cascadia moves for summary judgment on Wilken's Title VII claim for gender

discrimination on the basis that sexual orientation is not a protected class under Title VII.

Cascadia's position is supported by a number of circuit courts.  *See Medina v. Income Support

Div. of New Mexico*, 413 F3d 1131, 1135 (10th Cir 2005) ("Title VII's protections, however, do

not extend to harassment due to a person's sexuality"); *Simonton v. Runyon*, 232 F3d 33, 35 (2nd

Cir 2000) ("The law is well-settled in this circuit and in all others to have reached the question

that [plaintiff] has no cause of action under Title VII because Title VII does not prohibit

harassment or discrimination because of sexual orientation"); *Bibby v. Philadelphia Coca Cola

Bottling Co.*, 260 F3d 257, 261 (3rd Cir 2001), *cert denied*, 534 US 1155 (2002) (citations

omitted) ("It is clear, however, that Title VII does not prohibit discrimination based on sexual

orientation"); *Wrightson v. Pizza Hut of America, Inc.*, 99 F3d 138, 143 (4th Cir 1996) (citations

omitted) ("Title VII does not afford a cause of action for discrimination based upon sexual orientation").[13]

In response, Wilken relies on *Lam v. Univ. of Hawaii*, 40 F3d 1551 (9th Cir 1994), which involved gender and race discrimination claims by an Asian woman against a university for denial of tenure. In *Lam*, the Ninth Circuit rejected the district court's compartmentalization of racism and sexism as two separate and distinct elements, explaining that "[l]ike other subclasses under Title VII, Asian women are subject to a set of stereotypes and assumptions suffered neither by Asian men nor by white women. In consequence, they may be targeted for discrimination 'even in the absence of the discrimination against [Asian] men or white women.'" *Id* at 1562 (citations omitted). Wilken requests that this court not separate her claims into one based on gender and one based on sexual orientation, but instead blend them together into the claims of a "lesbian woman," part of a distinct subclass of the protected class of gender.

However, *Lam* involved complaints of sex and race discrimination, both of which are protected categories under Title VII. Here Wilken complains of sexual orientation discrimination which is not protected under the statute. Even if sexual orientation were protected, the blending theory is inapplicable because Wilken has submitted no evidence that she was discriminated against (or complained of discrimination) because of her gender as opposed to her sexual orientation. Wilken admits that she would not have been discriminated against had she been a heterosexual woman in a relationship with a male coworker. *See Noviello v. City of*

---

[13] While "[d]iscrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII" (*see Schwenk v. Hartford*, 204 F3d 1187, 1202 (9th Cir 2000)), such gender stereotyping has not been alleged here.

*Boston*, 398 F3d 76, 88 (1st Cir 2005) (finding *Lam* inapplicable where plaintiff had no evidence of discrimination based on a subclass of persons possessing *both* protected traits).

Wilken also relies on *McGinest v. GTE Serv. Corp.*, 360 F3d 1103, 1118 (9th Cir 2004), for the proposition that Title VII precludes discrimination against an employee because of the employee's close association with a member of a protected class. Wilken contends that an employer cannot discriminate against a female employee (herself) because of her close association with another female employee (Padilla). However, Wilken's reliance on *McGinest* is unwarranted. *McGinest* focused on the objectivity of the racially hostile environment experienced by the African American plaintiff, not the white employee. The court found that racially offensive comments were directed at the white employee "specifically in order to anger McGinest." *Id.* "If racial animus motivates a harasser to make provocative comments in the presence of an individual in order to anger and harass him, such comments are highly relevant in evaluating the creation of a hostile work environment, regardless of the identity of the person to whom the comments were superficially directed." *Id.* In contrast, Wilken's Title VII claims are based not on her identity as a woman or on someone else's discrimination indirectly targeting her identity as a woman, but based on her identity due to her sexual orientation *and* her relationship with another coworker in the same building.

///

///

///

///

39 - FINDINGS AND RECOMMENDATIONS

Unlike its Oregon counterpart, Title VII has yet to be amended to protect persons discriminated against on the basis of their sexual orientation. Accordingly, Cascadia should be granted summary judgment on Wilken's Title VII claims of gender discrimination.[14]

## III.    Gender Discrimination Under ORS 659A.030 (Second Claim) and Unlawful Discrimination Under Portland City Code (Fifth Claim)

### A.    Legal Standard

Under ORS 659A.030(1)(a),[15] it is an unlawful employment practice for an employer to discharge an individual because of the individual's gender or because of the gender of any other person with whom the individual associates. ORS 659A.030(1)(b) prohibits discrimination on the same grounds in compensation, terms, conditions or privileges of employment. In *Tanner v. OHSU*, 157 Or App 502, 516, 971 P2d 435, 442 (1998), the Oregon Court of Appeals held that the prohibitions against discrimination under ORS 659A.030 encompass discrimination based upon sexual orientation. The City Code of Portland also prohibits discrimination based upon sexual orientation which is enforceable through a civil action in court. PCC 23.01.080(E); *Sims v. Besaw's Café*, 165 Or App 180, 197, 997 P2d 201, 211 (2000) (*en banc*).

Oregon courts have rejected the burden shifting formula of *McDonnell Douglas*. *Callan v. Confed. of Ore. Sch. Admin.*, 79 Or App 73, 78 n3, 717 P2d 1252, 1254 n3 (1986).[16] However,

---

[14]  The court need not address Cascadia's alternative argument that the Title VII discrimination claim is time-barred.

[15]  ORS 659.030 was amended by 2007 Oregon Laws Ch. 100 (S.B. 2), which expressly stated that sexual orientation is a protected ground. For purposes of this motion, the court will interpret the *former* ORS 659.030, which was in effect during all the relevant times.

[16]  In a federal diversity case involving a different section of ORS Chapter 659A, the Ninth Circuit applied the *McDonnell-Douglas* burden-shifting framework rather the Oregon analysis. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F3d 1080, 1091 (9th Cir 2001). However, *Snead* is inapplicable to this case which is premised on supplemental jurisdiction, rather than diversity jurisdiction. *See Pascoe*, 199 F Supp 2d at 1052 n4. After being afforded the opportunity to submit additional briefing on the issue, Cascadia agreed that the burden shifting analysis in *McDonnell-Douglas* does not apply to Wilken's supplemental state and city claims.

they also have acknowledged that the requirements for a *prima facie* case of discrimination

under federal law also apply to state law claims.  *See Henderson v. Jantzen*, 79 Or App 654, 658,

719 P2d 1322, 1324, *rev denied*, 302 Or 35, 726 P2d 934 (1986), citing *Texas Dept. of Comm.*

*Affairs v. Burdine*, 450 US 248, 253 (1981).  A plaintiff must establish a *prima facie* case of

disparate treatment unlawful discrimination by showing that:  (1) she belongs to a protected

class; (2) she was performing her position in a satisfactory manner; (3) she was subjected to an

adverse employment action; and (4) similarly situated persons outside her protected class were

treated more favorably or her position was filled by a person outside her protected class.  *Aragon*

*v. Republic Silver State Disposal, Inc.*, 292 F3d 654, 658 (9th Cir 2002) (*en banc*) (citation

omitted); *Villiarimo v. Aloha Island Air, Inc.*, 281 F3d 1054, 1062 (9th Cir 2002) (citation

omitted).  "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . .

. on summary judgment is *minimal* and does not even need to rise to the level of a preponderance

of the evidence."  *Aragon*, 292 F3d at 659 (citation omitted, emphasis in the original).

For the reasons below, this court finds that Wilken has submitted sufficient evidence to

establish a *prima facie* case of discrimination.  Therefore, Cascadia's motion for summary

judgment on the Second and Fifth Claims should be denied.

**B.**     ***Prima Facie* Case**

**1.       Protected Class**

Wilken is a member of a protected class under *Tanner* because she is female and entered

into a relationship with another female and under PCC 23.01.080(E) because she is a lesbian.

Cascadia argues that Wilken has conceded that her claim is not based on being a lesbian or on

being a woman in a relationship with another woman by testifying that: "I believe that if I was in

41 - FINDINGS AND RECOMMENDATIONS

- - was a lesbian - - am a lesbian, was in a relationship with someone who didn't work in the administrative building that I would not have been terminated." Wilken Depo, pp. 106-07. She believed that Garvey discriminated against her because she was a "lesbian dating another employee in the administrative offices." *Id* at 126-27.

Wilken was not terminated during her previous relationship with a woman employee, Esplin, indicating a certain degree of acceptance of Wilken's sexual orientation by her supervisors. However, Esplin worked at a different location, while Padilla worked in the same building as Wilken next door to the Housing Department. It is reasonable to infer that bias and discrimination are most prevalent when the behavior they target (here, a romantic relationship between two women) is most visible. Reading Wilken's deposition as narrowly as Cascadia urges would remove protection from discriminatory conduct to employees in same-sex relationships who work together and do not hide their relationship.

### 2.    Job Performance

Wilken has presented sufficient evidence to satisfy her minimal *prima facie* burden that her job performance was satisfactory since she: (1) was employed with Cascadia or its predecessor companies for 13 years and an Occupancy Specialist since 2002; (2) was asked to audit the work of other employees; (3) as the senior person in the Occupancy Specialist position was given discretion to decide on how to organize her files; (4) was assigned to train a new Occupancy Specialist because Cascadia recognized her as "the expert" in compliance monitoring; (5) had no performance evaluations in her file contrary to Cascadia's policy; and (6) was not on probation or any work plan at the time of her termination.

Cascadia counters that even if Garvey thought highly of Wilken's skills at one point in time, Wilken was not performing her job satisfactorily at the time of her discharge. Instead, Cascadia argues that: (1) Wilken displayed inappropriate conduct in the workplace (as evidenced by the complaints of her coworkers); (2) Garvey intended to place Wilken on a work plan after one of her building projects was negatively audited in August 2005; and (3) Wilken engaged in poor judgment and violated Cascadia policies when she had Padilla bring home original, unduplicated tax credit files. However, these arguments address why Cascadia did not discriminate against Wilken by terminating her and should not be conflated into the analysis of the *prima facie* case. *See Henderson*, 79 Or App at 658, 719 P2d at 1324 (a "plaintiff's *prima facie* case does not disappear merely because a defendant asserts a nondiscriminatory reason which may or may not persuade the trier of fact") (citations omitted).

### 2. Adverse Employment Action

The parties agree that Wilken's discharge is an adverse employment action, but disagree whether Wilken suffered any other adverse employment actions. Wilken alleges that Cascadia imposed different terms and conditions of employment on her in the form of rules and restrictions that did not apply to others. On March 30, 2005, Garvey and Woods summoned Wilken to discuss her relationship with Padilla and implemented rules affecting Wilken, namely that she could no longer go into Padilla's cubicle or hide behind the wall in Padilla's cubicle, had to keep her hands visible at all times while talking to Padilla, and was supposed to limit her use of the copier in the Billing Department. In addition, Garvey required Wilken to take breaks and lunches away from her desk.

43 - FINDINGS AND RECOMMENDATIONS

ORS 659.030(b) makes it unlawful to discriminate against protected individuals in the compensation, terms, conditions, or privileges of employment.  Neither the March 30, 2005 meeting, the rules allegedly imposed, or the written warnings affected Wilken's job duties, salary, benefits, or future career prospects with Cascadia.  Wilken Depo, pp. 116, 121, 124-25; Garvey Decl, ¶ 5.  At best, they are only minor changes to the workplace environment which did not affect the ability of Wilken to perform her job.  *See Frank v. United Airlines, Inc.*, 216 F3d 845 (9th Cir 2000) (women were required, as a condition of employment, to maintain a different weight standard than their male counterparts).  As a result, such conduct does not amount to adverse employment actions for purposes of Wilken's discrimination claims.[17]

### 3. Replacement by Someone Outside Wilken's Protected Class *or* Favorable Treatment of Others Not in Wilken's Protected Class

#### a. Treatment of Others Regarding Termination

According to Padilla, Wilken was replaced by someone outside her protected class of lesbian females, namely by a heterosexual female.  Padilla Decl ¶ 44.  Cascadia objects to the admissibility of Padilla's declaration, contending that Padilla was simply speculating about the replacement's sexual orientation based on photos on her desk and who dropped her off at work.  This court agrees that Padilla's belief, uncorroborated by any facts (such as a deposition of Wilken's replacement), is simply speculation.  "Conclusory allegations unsupported by factual data cannot defeat summary judgment."  *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F3d 1074, 1078 (9th Cir 2003) (citation omitted).

---

[17] In contrast, such actions may support a claim for sexual harassment in the form of a hostile workplace (*Meritor Savings Bank v. Vinson*, 477 US 57, 58 (1986)) or as evidence of retaliation.  They may also be pertinent to prove pretext.

Therefore, Wilken must submit evidence that persons outside her protected class were treated more favorably than her by not being terminated for similar conduct.  In order to identify the right comparators, the court must determine the conduct for which Wilken was terminated. In the Employee Separation Report and the Status Change Notice, the reasons given for Wilken's termination are violating Cascadia policies 2.2.0 (generally discussing non-disclosure and confidentiality), 11.2.0 (procedures for handling subpoenas of client files), and engaging in the "unauthorized removal of 16 files required to be kept on site."  Brischetto Response Aff, Exhibits F & N.  Later, Human Resources stated that Wilken violated policy 11.1.1 (confidentiality requirements concerning the use or disclosure of "clients' confidential health information without valid client permission"), rather than 11.2.0.  *Id*, Exhibit C, p. 6; Timme Depo, p. 149.  Beroz added a violation of policy 3.1.0 (which sets forward standards of conduct and provides that employees should expect to be terminated if they engage in careless, reckless, or intentional conduct that could potentially result in bodily injury, damage to agency property, or the property of others).  Brischetto Response Aff, Exhibit C, p. 4; Beroz Depo, p. 101.[18]

To prove that similarly situated employees outside her protected class were treated differently than her, Wilken asserts that a male employed as an Asset Manager and a heterosexual female employed as an Occupancy Specialist routinely removed entire tenant files from the Housing Department without apparent action to seek permission and without any apparent discipline (Wilken Decl, ¶¶ 49-50).  She adds that numerous other male and female employees from other departments removed files from the Housing Department.  *Id* at ¶ 53.

---

[18]  Wilken contends that Cascadia cannot get its story straight on what company policies she allegedly violated. Cascadia's alleged motives for termination are *only* assessed in order to determine potential comparators and not for their truth.

45 - FINDINGS AND RECOMMENDATIONS

However, these assertions are vague and speculative since Wilken does not identify these individuals or contend that the Housing Department was aware of their actions and did nothing.

Wilken also submits evidence that Cascadia knew that other employees removed files. She points to Timme's admission that a regular practice existed within Housing for the removal of files from the Department (Timme Depo, p. 156) and to testimony by Garvey that she knew the conduct was occurring (Wilken Depo, pp. 153-55; Garvey Depo, p. 131). Cascadia responds that it is "unaware of any employee in Administration, for the period July 2002 to November 22, 2005 [other than Wilken and Padilla] who has taken *original, non-copied, confidential files* to his/her home" without authorization. Brischetto Response Aff, Exhibit J, pp. 2-4 (emphasis added). Cascadia also denies being aware during the same period of "any employee in Administration [other than Wilken and Padilla] who has taken *confidential files* home with or without authorization." *Id* at 4.

However, Cascadia also admits that it knew Thomas took "portions of reproducible *confidential* files from the office." *Id*. Cascadia does not explain why taking "portions" of files is different from taking entire files, or what the difference between "reproducible" and "non-copied" is. It also is unclear whether Thomas had authorization to remove these confidential documents. Cascadia notes that Thomas "has taken portions of reproducible, confidential files home after informing her supervisor that she would be doing work involving portions of said files." *Id*. The fact that Garvey was aware of the subject matter of Thomas's work does not mean that she gave Thomas permission to remove these files and work from home. Thomas's position on the issue is also inconsistent. On the one hand she admits that the compliance training never addressed "anything specific about not taking files outside of the building," but on

46 - FINDINGS AND RECOMMENDATIONS

the other hand states that an unspoken rule exists that "people know that you do not take files." *Id*, Exhibit S.

Wilken also submits evidence that within a week of her termination, Garvey authorized the Housing Department staff to remove up to one tax credit file[19] from the office without her permission, and more files if they sought permission.  Brischetto Response Aff, Exhibit AE, p. 1. This contradicts Beroz's assertion that no written policy was necessary since all employees knew these files could not be removed from the office.  Beroz Depo, p. 50.

The evidence regarding Thomas and the policy imposed by Garvey after Wilken's termination are sufficient *prima facie* proof to establish a reasonable inference that similarly situated employees were treated more favorably than Wilken.  Thus, the court need not evaluate Wilken's other evidence of potential comparators.[20]

### b.    Treatment of Others Regarding the Rules Imposed on Wilken

Wilken has offered some evidence that the rules and restrictions imposed on her were different from the rules and restrictions imposed on male and heterosexual female employees. Timme sent an email to Woods, Zurfluh and Garvey regarding Wilken not being allowed to go into Padilla's cubicle stating that "our message really needs to focus on professional behavior and we cannot discriminately limit employee access."  Lively Decl, Exhibit 45.  Wilken also

---

[19] The exact language refers to tenant files.  It may be implied that these tenant files are tax credit files since Garvey warned that if such files are lost, Cascadia could lose major funding.

[20] Cascadia disputes that *similarly situated* employees outside Wilken's protected class were treated more favorably. Individuals are similarly situated when they have similar jobs and display similar conduct.  *Vasquez v. Co. of Los Angeles*, 349 F3d 634, 641 (9th Cir 2003) (emphasis added).  Urging a narrow reading of "similarly situated," Cascadia argues that only employees within the same department with the same supervisor and who were similarly situated at the time of the alleged discriminatory act should be considered as comparators, and that the Accounting and Human Resources employees identified by Wilken are not proper comparators.  Whether these employees were similarly situated is a question that does not need to be addressed on summary judgment.  The court will simply note that all of Cascadia's employees were subject to the policies that Wilken allegedly violated.

47 - FINDINGS AND RECOMMENDATIONS

Case 3:06-cv-00195-HA    Document 127    Filed 08/10/07    Page 48 of 64

testified that Garvey required her to take breaks and lunches away from her desk a week or two

before she imposed that requirement on the other employees in the Housing Department.  Wilken

Depo, p. 124.[21]  However, as noted above, imposing the rules and restrictions on Wilken does not

arise to the level of an adverse employment action, and may only be useful as evidence of

pretext.

**IV.    Retaliation Claim Under 42 USC § 2000e-3(a) (Third Claim) and ORS 659A.030 (Fourth Claim)**

        **A.    Legal Standard**

42 USC § 2000e-3(a) prohibits discrimination against any applicant or employee

"because he has opposed any practice made an unlawful employment practice by [Title VII]."  In

order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that:

(1) she engaged in a protected activity (opposition to discrimination); (2) she was subjected to an

adverse employment decision; and (3) there is a causal link between the protected activity and

the adverse action.  *Yartzoff v. Thomas*, 809 F2d 1371, 1375 (9th Cir 1987).  Because Title VII

does not protect against discrimination on the basis of sexual orientation, retaliation for such a

complaint is not protected.  *Medina*, 413 F3d at 1135.  Therefore, Cascadia's motion for

summary judgment on the Third Claim for retaliation should be granted.[22]

ORS 659A.030(1)(f) makes it an unlawful employment practice "for an employer to

discharge, expel or otherwise discriminate against any other person because that other person

---

[21]  Wilken testified that Padilla's conduct and frequency of visits to the Housing Department during lunch or breaks was no different than those of males and heterosexual females, yet those visitors were not labeled a "distraction."  Wilken Decl, ¶ 23.  Even after the new policy was imposed, it was not enforced against a male employee (Patrick Franks) and a heterosexual female employee (Katie Ness) who frequently stopped for lengthy socializing sessions with Kassen.  *Id* at ¶ 31.  However, these are examples of others being treated differently than Padilla, not Wilken.

[22]  The court need not address Cascadia's alternate argument that Wilken's Title VII retaliation claim is time-barred.

48 - FINDINGS AND RECOMMENDATIONS

has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." The parties agree that to establish a *prima facie* case of retaliation under Oregon law, a plaintiff must meet the same elements as under Title VII. Under *Callan*, should Wilken meet her *prima facie* burden of retaliation, this claim cannot be dismissed on summary judgment.

      **B.**    **Analysis**

          **1.**      **Protected Conduct**

Cascadia identifies only one act of protected conduct, namely Wilken's March 31, 2005 complaint to Human Resources. Wilken Decl, ¶ 7.

Wilken contends that protected conducts includes not only her own complaints, but also Padilla's complaints to Human Resources about her own managers. As a result, she alleges that she also engaged in the following protected activities commencing on March 30, 2005, and extending through October 2005: (1) Wilken and Padilla met with their supervisors Garvey and Woods on March 30, 2005, who imposed rules which Padilla complained of as discriminatory (Padilla Decl, ¶ 11); (2) on April 20, 2005, Padilla complained to Human Resources that Woods continued to impose discriminatory rules on Wilken when she came into the Billing Department (*id* at ¶ 16); (3) in June 2005, Padilla complained to her supervisor that she was being singled out in the Billing Department because of a vendetta directed against Wilken and her (*id* at ¶ 19); (4) in July 2005, when Garvey attempted to apply Cascadia's visitor policy to Padilla's presence in the Housing Department, Wilken confronted Garvey and told her that it was not right to apply the policy to Padilla (Wilken Decl, ¶ 18); (5) Padilla complained to her supervisor that Garvey's attempt to keep her out of the Housing Department was discriminatory (Padilla Decl, ¶ 27);

(6) Wilken and Padilla reported Garvey's conduct to Human Resources (Wilken Decl, ¶ 19); and

(7) as late as October 2005, Wilken continued to point out to Garvey the different treatment she

was being exposed to within the department (*id* at ¶ 31).

Cascadia argues that Wilken is not protected from retaliation for Padilla's complaints to

Human Resources or her supervisor.  The courts disagree as to whether Title VII prohibits

retaliation against an employee because of the protected activities of other persons.  *See*

*USEEOC v Bojangles Restaurants, Inc.*, 284 F Supp2d 320, 326 (MD NC 2003) (cases collected

in footnotes 3 and 4).

Title VII provides protection against retaliation both for persons who make a charge of

discrimination ("opposition" prong) and for those who have "assisted or participated in any

manner" in an investigation ("participation" prong).  *Bojangles*, 284 F Supp 2d at 327.  The

"participation" prong should not be interpreted so broadly as to include anyone whose name is

mentioned in another employee's complaint.  However, it does includes those whom the

employer has reason to believe is assisting the employee in protected activity.  In *Bojangles*,

the plaintiff and her fiancé worked for the same company.  After being terminated, the fiancé

informed the company of his intention to file a charge with the EEOC.   The plaintiff, who had

been on maternity leave, called the company asking to return to work because they needed

money.  The court found that because the plaintiff used to work with her fiancé, she may have

*direct* knowledge of the truth or falsity of her fiancé's allegations.  Thus, it would be reasonable

to believe that her employer perceived her as participating in or assisting the protected activity.

The court was also concerned with the financial dependence of the fiancé on the plaintiff's job.

Similarly in this case, Wilken and Padilla both worked for Cascadia and lived together. All of the complaints, whether made by Padilla, Wilken or both, concern the same subject matter, namely the imposition of discriminatory rules on the two women which were not imposed on others. Further, all of Padilla's complaints allegedly concerned either conduct directed at Wilken or discrimination against Wilken as part of an unlawful motive. Cascadia had every reason to believe that Wilken and Padilla were acting jointly and assisting each other. Thus, the court will consider the additional complaints identified by Wilken as sufficient to constitute protected conduct for purposes of a *prima facie* retaliation case. *See Boynton-Burns v. Univ. of Oregon*, 197 Or App 373, 380, 105 P3d 893, 897 (2005) (informal complaints to superiors represent protected conduct); *Trent v Valley Elec. Ass'n*, 41 F3d 524, 526 (9th Cir 1994), *appeal after remand*, 195 F3d 534 (1999) and *cert denied*, 531 US 871 (2000) (citation omitted) (the opposition must be directed at an unlawful employment practice of an employer).

### 2.    Adverse Employment Actions Underlying Wilken's Retaliation Claim

The parties agree that termination constitutes an adverse employment action.[23]

### 3.    Causal Link Between Protected Conduct and Termination

The Ninth Circuit has endorsed at least three ways to show that retaliation was a motivating factor behind an adverse employment decision: (1) evidence of proximity in time between the protected action and the adverse employment decision; (2) evidence that the employer expressed opposition to the employee's speech either to the employee or to others; or

---

[23] Wilken also alleges other adverse employment actions as part of her hostile workplace claim, which is discussed separately below.

(3) evidence that the employer's proffered explanations for the adverse employment decision are false and pretextual. *Keyser v Sacramento City Unified Sch. Dist.*, 265 F3d 741, 751-52 (9th Cir 2001).

Wilken contends that she has produced evidence of proximity in time between the protected action and the involuntary discharge, together with evidence that Cascadia's proffered explanations are false and pretextual. Because the court finds the temporal proximity is sufficient for a *prima facie* burden of proof, it need not engage in the *McDonnell-Douglas* analysis of pretext.

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Co.*, 341 F3d 858, 865 (9th Cir 2003) (citations omitted). However, the timing must be "very close." *Clark Co. Sch. Dist. v. Breeden*, 532 US 268, 273, *reh'g denied*, 533 US 912 (2001) (internal quotation marks and citations omitted). The Ninth Circuit has declined to infer causation from timing alone when the link between protected activity and the adverse employment action was too remote. *Villiarimo*, 281 F3d at 1065 (ten and 18 month gap too long). On the other hand, while there is no bright line rule, "three to eight months is easily within the time range that supports an inference of retaliation." *Coszalter v. City of Salem*, 320 F3d 968, 977 (9th Cir 2003). In fact, "an eleven month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon*, 283 F3d 1070, 1078 (9th Cir 2002) (citations omitted). Furthermore, finding that time periods between three and eight months are too long is erroneous when other circumstances in addition to proximity in time support an inference of retaliation. *Coszalter*, 320 F3d at 977.

52 - FINDINGS AND RECOMMENDATIONS

Viewing the facts in the light most favorable to Wilken, the protected conduct commenced on March 31, 2005, continued through mid-July 2005 when Wilken confronted Garvey about the visitor policy and (together with Padilla) reported Garvey's conduct to Human Resources, and extended to October 2005 when Wilken pointed out the different treatment of Kassen.  Wilken was terminated on November 22, 2005.  Thus, a period of approximately seven and a half months expired between Wilken's initial complaint and her termination, four months between the mid-July 2005 complaint and termination, and one month between Wilken's last complaint her termination.  Under *Coszalter*, this temporal proximity is sufficient to infer causation for purposes of the *prima facie* case.

Cascadia argues that temporal proximity is insufficient to create a genuine issue of fact where unrebutted evidence shows that the decision-maker had no knowledge that the employee engaged in protected conduct.  *See Brungart v. BellSouth Telecomm., Inc.*, 231 F3d 791, 799 (11th Cir 2000), *cert denied*, 532 US 1037 (2001).  The parties disagree on the identity of the decision-maker and whether the decision-maker knew that Wilken had engaged in protected conduct before termination.  Cascadia contends that Beroz made the decision to terminate Wilken on his own and that he was not aware that Wilken had made a complaint of discrimination during her employment with Cascadia.  Wilken responds that two individuals from Human Resources (Timme and Scott) and two individuals from Housing (Beroz and Garvey) all participated in the termination decision and that all four knew of her protected activities.

The record reveals the following facts.  Garvey informed Beroz about Wilken's removal of confidential tax credit files from the office and recommended she receive a written warning.

53 - FINDINGS AND RECOMMENDATIONS

Beroz Depo, p. 30; Garvey Depo, p. 163.  Beroz believed the act revealed extraordinarily bad

judgment and warranted more than a written warning.  Beroz Depo, p. 30 ("I said I thought this

was an offense that could warrant termination.").  The same day, Beroz and Garvey consulted

with Timme who thought the allegations needed to be investigated.  *Id* at 32-33.  If it were up to

Timme, she would have recommended a written warning.  Timme Depo, p. 143.  In a subsequent

conversation with Beroz, Garvey indicated that the investigation confirmed that Wilken had

taken the files away from the office.  Beroz Depo, p. 40.  Beroz told Garvey that if this was a

terminable offense consistent with Cascadia's policies, then Wilken should be terminated.  *Id* at

40-41.  According to Beroz, Garvey informed him that Human Resources determined this was

"an offense for which termination could be done" (*id* at 41), and Beroz made the decision to

terminate Wilken:

> Q.  And it sounds like you received some information from Garvey that
> there was a policy violation for which was a terminable offense?
> A.  Yes.
> Q.  And it sounds like you received some information from Garvey that
> the call was up to you as to whether to terminate?
> A.  I did not receive information to that effect from Garvey.
> Q.  Did you receive it from someone else?
> A.  This is incumbent in my position.  I don't need Garvey's confirmation
> that I have the authority to do that.
> Q.  But then your testimony is that you then told Garvey that you had
> decided you wanted to proceed with the termination?
> A.  That is correct.

*Id* at 44.

Garvey testified that after the investigation, Human Resources recommended termination.

Garvey Depo, p. 164.  Timme and Alana Scott met with Garvey and talked to her about "the

decision that they had come to regarding [Wilken's] termination."  *Id* at 180.

54 - FINDINGS AND RECOMMENDATIONS

Q.  So your understanding was that human resources decided after the investigation she should be terminated?
A.  Yes.
Q.  And did they relay that to you?
A.  That was their recommendation, that this was a terminable offense.
. . .
Q.  So it sounds like the decision to terminate her was made by human resources is what I'm understanding from you?
A.  Yes, based on the information that they found from all the people they interviewed.
Q.  And then there's listed a meeting on November 22nd between you and Neal Beroz. . . .
A.  That I let him know what HR had talked to me about and that this was the decision and this is the action that we were going to move forward with.
Q.  What was his response?
A.  If that's what HR has found during their investigation, then he supports their decision.

*Id* at 181-82.

While Garvey's testimony is murky at times, the evidence as a whole viewed in the light most favorable to Wilken indicates that Beroz made the final decision to terminate Wilken after Human Resources (Timme and Scott) recommended that the offense was terminable.  In other words, while Beroz may have been the final decision maker, Timme and Scott certainly influenced Beroz's decision with their recommendation.

It is undisputed that both Timme and Scott were aware of Wilken's discrimination complaints against Garvey and Woods.  Despite his statement that he was unaware of Wilken's discrimination complaint against Garvey or anyone else in the Housing Department (Beroz Decl, ¶ 4), Beroz was aware that Wilken's partner was a female employee in the Billing Department.  Beroz Depo, pp. 63-64.  He also knew that and that Garvey and Woods had a meeting with Wilken and her partner to discuss their relationship, although he could not remember whether

55 - FINDINGS AND RECOMMENDATIONS

Garvey ever informed him of the result of that meeting. *Id* at 69. Beroz also was aware of a dispute between Padilla and the Billing Department and allegations that the Billing Department treated Wilken and Padilla in a discriminatory manner. *Id* at 64. However, he testified that Garvey informed him Wilken did not feel discriminated against in the Housing Department. *Id* at 18. Lastly, he was aware there had been complaints in the Housing Department about Wilken and Padilla spending lunch and breaks at Wilken's desk and making it difficult for other employees to work. *Id* at 65.

Beroz's knowledge of discrimination problems involving Wilken and Padilla, combined with Timme and Scott's knowledge of Wilken's complaints and their role in the termination decision, is sufficient to create a genuine issue of material fact as to whether the ultimate decision maker (Beroz) had knowledge of Wilken's protected conduct before termination. Therefore, the inference of retaliation created by the temporal proximity is sufficient to establish causation for purposes of the low *prima facie* burden of proof.

## V.    <u>Common Law Wrongful Discharge (Sixth Claim)</u>

Wilken also brings a claim of common law wrongful discharge based upon the allegations that Cascadia terminated her employment in retaliation for complaining about sexual discrimination and sexual harassment.

A wrongful discharge claim may be pursued only if the statutory remedies are inadequate. *Holien v. Sears Roebuck and Co.*, 298 Or 76, 97, 689 P2d 1292, 1304 (1984); *Carlson v. Crater Lake Lumber Co.*, 103 Or App 190, 195, 796 P2d 1216, 1220, *modified on reconsideration on other grounds*, Or App 314, 804 P2d 511 (1991). Cascadia does not dispute

that the remedies under ORS Chapter 659 are not adequate to redress the injury alleged and that the tort of wrongful discharge fills that gap.

Instead, Cascadia attacks the merits of the claim, arguing that Wilken was not discharged for exercising her protected rights. Since is a genuine issue of material fact exists as to whether a causal link exists between Wilken's protected activity and her termination, a genuine issue of material fact also exists as to her wrongful discharge claim. Therefore, Cascadia's motion for summary judgment on the Sixth Claim should be denied.

**VI.**     **Hostile Work Environment**

The Complaint does not allege a separate claim for a hostile work environment. However, Wilken clarifies in her opposition to Cascadia's summary judgment motion that her hostile workplace claims are based upon unlawful gender discrimination, sexual orientation discrimination, and retaliation.

    **A.**     **Legal Standard**

A hostile work environment may constitute an adverse employment action sufficient to satisfy the second prong of a Title VII retaliation *prima facie* case. *Ray v. Henderson*, 217 F3d 1234, 1244-45 (9th Cir 2000) (citation omitted). The Ninth Circuit also has recognized a hostile work environment claim under Title VII based on sexual harassment. *Ellison v. Brady*, 924 F2d 872, 875 (9th Cir 1991).

To establish a hostile work environment, the plaintiff must show "(1) that she was subjected to verbal or physical conduct based on her race or national origin; (2) that the conduct was unwelcome; and (3) that the conduct was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment.'" *Galdamez v. Potter*,

57 - FINDINGS AND RECOMMENDATIONS

415 F3d 1015, 1023 (9th Cir 2005) (citation omitted). Whether a work environment is hostile depends on all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 US 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Nichols v. Azteca Restaurant Enter., Inc.*, 256 F3d 864, 872 (9th Cir 2001). The required severity of the conduct varies inversely with its pervasiveness and frequency. *McGinest*, 360 F3d at 1113.

The work environment must "both subjectively and objectively be perceived as abusive" because of the sexual harassment. *Burrell*, 170 F3d at 954. The objectively reasonable person standard is measured by what a reasonable person in plaintiff's protected class would consider abusive in the same situation. *Ellison*, 924 F2d at 879.

**B.    Analysis**

As evidence of a pattern of conduct that was severe, pervasive, and altered the conditions of the workplace, Wilken submits that: (1) at the March 30, 2005 meeting, Garvey and Woods accused her and Padilla of holding hands, kissing, and hugging at work, and imposed rules limiting Wilken's presence in the Billing Department which were not imposed on others; (2) even after a complaint to Human Resources, Woods continued to limit Wilken's access to the Billing Department and informed Padilla that she could not be in a room with Wilken with the door closed; (3) after a second complaint to Human Resources, Wilken and Padilla began experiencing hostility in both the Billing and Housing Departments; (4) in May 2005, Padilla's

58 - FINDINGS AND RECOMMENDATIONS

supervisors began criticizing her work and altering her job assignments in a manner designed to keep her present in the Billing Department; (5) in June 2005, Padilla's supervisors tried to take away her four-day, ten-hour per day work week; (6) in June 2005, Woods began criticizing Padilla for going into the Housing Department; (7) in July 2005, Padilla applied for a position in Housing because of the hostility in the Billing Department, and a Housing employee who had expressed negative feelings about homosexuals objected to the application and to Wilken participating in the hiring process; (8) in July 2005, Garvey directed an angry outburst at Wilken and told her that Padilla needed to comply with the visitor policy when she came into the Housing Department; (9) subsequently, Garvey issued a written memo blaming Wilken for the incident and did not speak to her for days; (10) in August 2005, Padilla's supervisors began adding undesirable work duties, imposing numerical goals, and then complaining that she was not achieving these goals; (11) in August 2005, Garvey directed another angry outburst at Wilken for errors in the work of another employee, and did not speak to her for almost a month.

In addition, Wilken contends that she and/or Padilla encountered incidents where supervisors would "out" them in front of others or make comments inferring jealousy about their relationship. Cascadia admits that on five occasions, Garvey, who apparently was having marital problems, told Wilken and Padilla that it would be easier to be a lesbian or that she would become a lesbian when she divorced her husband. Wilken Depo, p. 72. Garvey marveled at how Wilken and Padilla could spend that much time together (since they lived and worked together), when Garvey could hardly stand to be with her husband on vacation. *Id* at 72-73.

Even accepting all of Wilken's allegations as true, they are not sufficiently severe and pervasive to amount to a hostile work environment. By comparison, *Ray* involved evidence that

the plaintiff was regularly yelled at, called a liar, a trouble maker and a rabble rouser, subjected

to pranks, falsely accused of misconduct, told to "shut up" and "that's a direct order," was the

victim of a physically threatening gesture by a supervisor and, after he filed a complaint with the

EEOC, had a supervisor tell his coworkers that he had made a death threat in the EEOC

complaint (and as a result had his work hours modified) even after an investigation cleared him

of this serious accusation.  With the exception of two comments by Zurfluh (not directed at

Wilken and not witnessed by Wilken), allegedly outing Padilla and another female in front of

other employees (*see* Padilla Depo, pp. 40, 44, 69, 143), there are no allegations of physical,

threatening, or objectively demeaning and frequent conduct sufficient to establish a hostile

workplace claim.  Therefore, Cascadia's motion for summary judgment on Wilken's hostile

work environment claims should be granted.

      As a result, this court need not address the merits of Cascadia's *Faragher/Ellerth*

affirmative defense or its arguments regarding its liability for the acts of Woods and Zurfluh.

## VII.    IIED Claim ("Ninth Claim")

### A.    Legal Standard

      To state a claim for IIED, a plaintiff must show that:  (1) defendant intended to inflict

severe emotional distress on plaintiff; (2) defendant's acts were the cause of plaintiff's severe

emotional distress; and (3) defendant's acts constituted an extraordinary transgression of the

bounds of socially tolerable conduct.  *McGanty v. Staudenraus*, 321 Or 532, 543, 901 P2d 841,

849 (1995) (citation omitted).  Conduct that is merely "rude, boorish, tyrannical, churlish and

mean" does not satisfy the high standard that the defendant's acts must constitute an

extraordinary transgression of the bounds of socially tolerable conduct.  *Patton v. J.C. Penney*

*Co.*, 301 Or 117, 124, 719 P2d 854, 858 (1986), *abrogated on other grounds by McGanty*, 321

Or at 544-45, 901 P2d at 849-50.  It is a question of law for the court to determine whether a

complaint sufficiently alleges conduct that constituted an extraordinary transgression of the

bounds of socially tolerable conduct.  *Delaney v. Clifton*, 180 Or App 119, 130, 41 P3d 1099,

1106, *review denied*, 334 Or 631, 54 P3d 1041 (2002) (citation omitted).

> **B.**     **Analysis**

Wilken analogizes her claim to other cases allowing an IIED claim to proceed.  In

*Franklin v Portland Comm. College*, 100 Or App 465, 471-72, 787 P2d 489, 492-93 (1990), the

supervisor called an African-American male by the name "boy," issued false reprimands, shoved

him, locked him in an office, and suggested that he apply elsewhere for employment.  In

*Lathrope-Olson v Dept. of Transp.*, 128 Or App 405, 407-08, 876 P2d 345, 346-47 (1994),

language was used to sexually harass women, such as "all women were good for was between

their legs" and a threat was made to push plaintiff into oncoming traffic.  *Whelan v Albertson's,*

*Inc.*, 129 Or App 501, 505-06, 879 P2d 888, 891 (1994), involved taunts like "queer," "Serge,"

and the use of crude language to ask plaintiff if he had sex with his date, plus repeating such

insults in front of customers and coworkers.

The allegations here have nothing in common with those in *Franklin*, *Whelan* and

*LaThrope-Olson*. While Wilken has identified five comments by Garvey that it would be better

to be a lesbian and a handful of "rules" that were applied to her in response to coworker

complaints, these allegations are different in quantity and in severity from those required to

sustain a claim for IIED.

However unwelcome and rude the comments complained of may have been, Wilken has simply not made a sufficient showing that Cascadia's actions constituted an extraordinary transgression of the bounds of socially tolerable conduct, acts that were intentional and outrageous. Therefore, Cascadia should be granted summary judgment against Wilken's Ninth Claim.

## RECOMMENDATIONS

Based on the foregoing reasons, Wilken's Partial Motion for Summary Judgment (docket # 70) should be GRANTED IN PART and DENIED IN PART as follows:

1. Granted as to Cascadia's violation of ORS 653.261 and the Fair Labor Standards Act ("FLSA"), 29 USC § 207, by failing to pay Wilken regular and overtime wages for the period she was misclassified as exempt from February 9, 2004, to June 30, 2005, denied as to the time period from March 1, 2003, to February 9, 2004, and denied as to Cascadia's violation of ORS 653.025 (minimum wages);

2. Denied as to the amount of $25,973.72 in minimum, regular and overtime wages due to Wilken;

3. Denied as to Cascadia's commission of 28 separate overtime wage violations during the relevant period;

4. Granted as to the statute of limitations being two years for Oregon wage claims under ORS 12.110(1) and three years on the FLSA claims upon a finding of willfulness under 29 USC § 255;

5. Denied as to Wilken's entitlement to penalties under ORS 653.055 for 28 separate violations of ORS 653.261; instead, if Cacadia is found liable for failure

to pay overtime wages under ORS 653.261, it should only be required to pay one

30-day penalty;

6. Granted as to Wilken's entitlement, in addition to the penalties under Oregon

law, to penalties under 29 USC § 260 upon a showing of willfulness; and

7. Granted as to Wilken's entitlement to the prejudgment interest under either the

FLSA or Oregon law, whichever is greater, less the amount of liquidated damages

awarded under the FLSA.

Also based on the foregoing reasons, Cascadia's Motion for Summary Judgment (docket

# 73) should be GRANTED IN PART and DENIED IN PART as follows:

1. Granted as to the First Claim (Title VII gender discrimination), the hostile work

environment claims, Third Claim (Title VII retaliation), and the Ninth Claim (IIED); and

2. Denied as to the Second Claim (gender discrimination under Oregon law), Fourth

Claim (retaliation under Oregon law), Fifth Claim (gender discrimination under Portland

City Code), and Sixth Claim (wrongful discharge).

In addition, based on Wilken's agreement, the Eighth and Tenth Claims should be

dismissed with prejudice.

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due August 27, 2007.  If no

objections are filed, then the Findings and Recommendation will be referred to a district judge

and go under advisement on that date.

63 - FINDINGS AND RECOMMENDATIONS

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 10th day of August, 2007.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge