IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JANETTE M. WILKEN,

               Plaintiff,                             CV-06-195-ST

        v.                                   FINDINGS AND
                                             RECOMMENDATION

CASCADIA BEHAVIORAL HEALTHCARE,
INC.,

               Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

On January 3, 2007, plaintiff, Janette Wilken ("Wilken"), filed an Amended Complaint

against her former employer, Cascadia Behavioral Healthcare ("Cascadia"), alleging claims for:

gender discrimination and harassment in violation of Title VII ("First Claim") and ORS

659A.030 ("Second Claim"); retaliation in violation of Title VII ("Third Claim") and ORS

659A.030 ("Fourth Claim"); unlawful discrimination under Portland City Code 23.01.050 ("Fifth

Claim"); common law wrongful discharge ("Sixth Claim"); federal and state wage violations

1 - FINDINGS AND RECOMMENDATION

under the Fair Labor Standards Act, 29 USC §§ 206-216 and the Oregon Wage and Hour Laws, ORS 653.261 ("Seventh Claim"); breach of an employment contract ("Eighth Claim"); intentional infliction of emotional distress ("IIED") ("Ninth Claim"); and negligent supervision ("Tenth Claim").

On January 22, 2007, Cascadia filed its Answer and Affirmative Defenses to Plaintiff's Amended Complaint (docket # 50) asserting a number of affirmative defenses, including Bad Faith (Eleventh Affirmative Defense) and After Acquired Evidence (Fourteenth Affirmative Defense).

Wilken has voluntarily dismissed her Eighth and Tenth Claims. By Order dated October 5, 2007, on the parties' cross-motions for summary judgment, the court dismissed Wilken's Title VII and IIED claims (First, Third and Ninth Claims).

On August 13, 2007, Wilken filed a new Partial Motion for Summary Judgment (docket # 128) seeking dismissal of Cascadia's Eleventh and Fourteenth Affirmative Defenses. At oral argument Wilken withdrew her motion with respect to the Eleventh Affirmative Defense based on Cascadia's stipulation that it does not concern the alleged forgery at issue in the Fourteenth Affirmative Defense. For the following reasons, Wilken should be granted summary judgment against the Fourteenth Affirmative Defense.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing

FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert*

*denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party." *Id* (citation omitted).

## UNDISPUTED FACTS

This court has previously summarized the undisputed facts in its prior Findings and

Recommendations, pp. 3-13 (docket # 127). In the interest of brevity, the court will set forth

only those facts pertinent to this motion.

Wilken began working for Cascadia in June 2002. Wilken Decl (docket # 71), ¶ 2.

Initially Wilken worked as an Asset Manager. Garvey Depo, p. 16. On March 1, 2003, Wilken

changed positions to Occupancy Specialist. Wilken Depo, pp. 36-37; Wilken Decl, ¶ 2. Her

new duties included involvement in the pre-application process, pre-screening of potential

applications, maintenance of the waiting list, recertification of tenants, maintenance of tenant

files, and processing move-out tenants. Garvey Depo, p. 21. She was also responsible for

compiling accurate tax credit files and auditing the work of other employees.  Wilken Depo, p. 138; Garvey Depo, pp. 123-25.

Incident to her employment, Cascadia required Wilken to review and acknowledge receipt of the Cascadia Behavioral Healthcare Policy and Procedural Manual ("Manual"). Lively Decl (docket # 138), Exhibits 8 & 9.  Wilken reviewed the Manual and signed an acknowledgment that she received it.  *Id*; Wilken Depo, pp. 23-24.  The Manual includes a section titled "Standards of Conduct" which sets forth types of conduct for which an employee can expect to be terminated.  Specifically, the Manual states:

> A. Termination should be *expected* if an employee is in violation of any of the following rules:
>
> 1) Dishonesty, including, but not limited to, falsification, misrepresentation, alteration or omission of information in Agency interviews, investigations, and on Agency records, timesheets, benefit enrollment records, invoices, medical history records, expense report records, accident reports, or health insurance claims. This also includes the fundamental expectation of honesty and integrity in all practices mentioned above.

Lively Decl, Exhibit 9, p. 3 (emphasis in original).

The Manual also contains a Code of Ethics, which provides, *inter alia*, that "[t]he employee will endeavor to always maintain the highest standards of personal conduct."  *Id* at 2.

In March 2004, Cascadia hired another Occupancy Specialist, Patty Thomas ("Thomas"). Thomas Depo, pp. 6, 9.  Wilken and Thomas had been friends since 1997 prior to working together at Cascadia.  Wilken Depo, p. 53.  Recognizing that Wilken was "the expert" in compliance monitoring, Wilken's supervisor assigned her to train Thomas for the position. Garvey Depo, p. 126.  The two divided Cascadia's housing buildings between them, but Wilken's responsibilities with the tax credit files remained unique.  Wilken Depo, pp. 140-41,

143.  She was responsible for making sure the tax credit files, including those prepared by Thomas, were complete and compliant.  *Id* at 141.

Certain residential buildings operated by Cascadia are eligible for tax credits.  As a non-profit organization, however, Cascadia does not need the tax credits and may sell them to investors.  Beroz Depo, pp. 23-24; Garvey Depo, p. 143.  Tax credit files are particularly important to Cascadia since the loss of these files would result in a significant financial loss to the organization.  Beroz Depo, p. 21.  Upon the initial opening of a tax credit eligible building, Wilken and Thomas were eligible for bonuses depending upon their performance.  Wilken Depo, pp. 38-39; Garvey Decl (docket # 76), ¶ 6; Lively Decl, Exhibit 7.

Cascadia receives funding through the U.S. Department of Housing and Urban Development ("HUD") for some tenants who meet specific income requirements.  Garvey Depo, p. 119.  Cascadia must recertify these tenants each year in order to continue receiving HUD funding.  *Id*  In August 2005, Oregon Housing and Community Services ("OHCS"), the contract administrator for one of Cascadia's HUD projects, contacted Garvey to give Cascadia an unsatisfactory review on OHCS's audit of the project's resident files (the "McCarthy Project").  Garvey Depo, p. 113.  Wilken bore primary responsibility for the McCarthy Project.  *Id* at 115; Wilken Reply Decl (docket # 142), ¶ 6.  Among the various problems identified by OHCS were "discrepancies with the dates" which the contract administrator suspected were "falsified."  *Id* at 115, 117.[1]  Wilken and Thomas both denied any wrongdoing.  *Id.*

---

[1]  The statements by the contract administrator would be hearsay if offered for their truth.  FRE 801(c).  However, they are admissible to show that Garvey, and, therefore, Cascadia, was on notice of potential fraudulent behavior by Wilken prior to her termination.

Cascadia terminated Wilken on November 22, 2005, ostensibly for violating Cascadia's policy by removing important tax credit files from her office to her home. Beroz Depo, pp. 43, 51-53, 73.

During her deposition on November 10, 2005, Thomas testified that she had seen Wilken "forge someone's signature several times" between March 2004 and November 2005. Thomas Depo, pp. 89-90. Subsequent to that deposition, Wilken served a Request for Production on Cascadia. Brischetto Aff, Exhibit B, p. 1. Request for Production No. 52 asked Cascadia to produce "any documents showing forged client signatures which were signed by plaintiff." *Id.* Cascadia objected to this request on the grounds that it was "unduly burdensome and speculative as it has not been established which, if any, documents plaintiff forged." *Id.*

On January 25, 2007, Wilken filed a motion to compel discovery (docket # 51). This court granted Wilken's motion as to Request for Production No. 52, setting April 28, 2007 as the deadline for Cascadia to produce responsive documents (docket # 63). Wilken has received no responsive documents. Brischetto Aff, ¶ 2.

## **FINDINGS**

Wilken seeks partial summary judgment on Cascadia's Fourteenth Affirmative Defense (After Acquired Evidence) insofar as it hinges on evidence that Wilken forged documents while employed by Cascadia. Wilken advances three arguments in support of her motion: (1) the defense should be stricken as a sanction for Cascadia failing to produce documents in compliance with the February 16, 2007 Order; (2) Cascadia's evidence is legally insufficient to carry its burden of proof; and (3) the federal after-acquired evidence doctrine does not apply to

state law claims.  Because the after-acquired evidence doctrine forms the core of the parties' dispute, it is addressed first.

## I.      After-Acquired Evidence Doctrine

### A.      Legal Standard

The after-acquired evidence doctrine is an affirmative defense to an employment discrimination claim. It permits an employer to avoid some liability by showing that it would have terminated an employee for wrongdoing discovered after a wrongful termination had the employer known of the wrongdoing prior to the wrongful termination.  *McKennon v. Nashville Banner Publishing Co.*, 513 US 352, 360-62 (1995); *Shnidrig v. Columbia Mach., Inc.*, 80 F3d 1406, 1412 (9th Cir 1996), *cert denied*, 519 US 927 (1996); *O'Day v. McDonnel Douglas Helicopter Company*, 79 F3d 756, 759 (9th Cir 1996).  To establish this defense Cascadia must: (1) present after-acquired evidence of an employee's misconduct; and (2) prove by a preponderance of the evidence that it would have fired the employee for that misconduct. *O'Day*, 79 F3d at 759.  If Cascadia prevails on this defense, Wilken may be precluded from seeking reinstatement or front pay.  *McKennon*, 513 US at 361-62.

### B.      State and City Discrimination Claims

Wilken challenges Cascadia's use of the after-acquired evidence doctrine because it has not yet been adopted by Oregon courts as an affirmative defense to discrimination claims under ORS 659A.030 or Portland City Code 23.01.050.

With respect to state discrimination claims, "Oregon courts have consistently held that the case law developed in federal courts in the interpretation of Title VII can be used to interpret Chapter [659A] of the Oregon Revised Statutes because the statutory schemes are similar and

Chapter [659A] is patterned after Title VII." *Conley v. City of Lincoln City*, 2004 WL 948427,

*13 (D Or 2004) (citing cases).  This district  has previously utilized the doctrine in cases

involving state employment discrimination claims. *See Grassmueck v. Johnson Controls Battery*

*Group*, 2007 WL 1989579 (D Or July 2, 2007);  *Montelongo v. Chase Manhattan Mortgage*

*Corp.*, 2005 WL 2346088 (D Or Sept. 22, 2005); *Thomas v. New Tech Electric, Inc.*, 2004 WL

2900696 (D Or Dec. 15, 2004).  Wilken offers no persuasive reason to depart from this practice.

With respect to the city discrimination claims, the Portland City Code expressly uses

Oregon's employment discrimination remedial scheme to enforce its own anti-discrimination

ordinance.  Portland City Code 23.01.080.[2]  Therefore, in the absence of any authority to the

contrary, this court will apply to the Portland City Code the same remedial doctrines applicable

to employment discrimination claims brought under Oregon law. Moreover, in addition to the

relief available under state law, the Portland City Code allows this court to "grant such relief as

it deems appropriate."  Portland City Code 23.01.080 E.  This language is sufficiently broad to

include the remedial adjustments made by the federal after-acquired evidence doctrine.

### C.    Analysis

#### 1.    Evidence of Wilken's Wrongdoing

The first element of the *O'Day* analysis requires Cascadia to present after-acquired

evidence of some wrongdoing committed by Wilken.  Cascadia offers a single piece of evidence

on this point:  the testimony of Patty Thomas.  At her deposition, Thomas testified that she had

observed Wilken forge signatures on company documents:

[2]  The reference in the Portland City Code is to an outdated version of Oregon's discrimination statutes and has not been updated to incorporate the correct references.  *See also*, *Sims v. Besaw's Café*, 165 Or App 180, 198, 997 P2d 201, 212 (2000) (noting relationship between the Portland provision and Oregon law).

Q. You were asked if in her drive to get the job done she engaged in conduct that was unethical or inappropriate in any way. What unethical or inappropriate conduct did she engage in?

A. I saw her forge someone's signature several times.

Q. Whose signature did you see her forge?

A. I don't recall the name of the resident, and I wouldn't be telling you because of confidentiality anyway, even if I did know.

Q. What other unethical or inappropriate conduct did you see her engage in?

A. That was the main one.

Q. How many occasions did you see her forge a resident's signature?

A. I'd say approximately three times.

Q. Concerning one resident or more than one resident?

A. More than one.

Q. Over what period of time did this occur?

A. The whole time that I worked with her.

Q. I guess the question is more like, she was terminated on November 22, 2005. How long did you know of this conduct?

A. From shortly after I was hired.

Q. So March of 2004?

A. Between March of 2004 and November of 2005, yes.

Thomas Depo, pp. 89-90.

At oral argument, Wilken's counsel clarified that Thomas claims she saw Wilken tracing client signatures onto unsigned forms. Because Thomas was trained by Wilken, worked closely with her, was her good friend prior to working at Cascadia, and had ample opportunity to observe Wilken at work, Cascadia maintains that this testimony alone is sufficient to raise a genuine issue of material fact on the first element of the after-acquired evidence defense.

Wilken responds that this testimony is inadmissible because it is legally insufficient to prove the misconduct claimed, citing FRE 1002 ("best evidence rule"). Wilken claims that, pursuant to the definition of a "forged instrument" in 165.002, Cascadia must demonstrate that a

written instrument has been "falsely made, completed or altered" by Wilken without authority. Because Cascadia is necessarily proving the contents of a written instrument, Wilken argues that best evidence rule bars Thomas's testimony in the absence of the production of the allegedly forged documents or an applicable exception.

As an initial matter, Wilken's reliance on the definitions in at ORS 165.002 are unavailing. Wilken cites no authority for the proposition that, in order to qualify as wrongdoing under the after-acquired evidence doctrine, Cascadia must satisfy the elements of a crime or prove that the alleged wrongdoing comports with definitions provided by Oregon's criminal code. Cascadia need only show that it has some evidence of employee wrongdoing as defined by its policies, and that what evidence it has, however scant or insignificant, would have been sufficient to merit immediate termination had it known of the wrongdoing while she was employed.

FRE 1002 dictates that, absent an exception, when a party is attempting to "prove the contents of a writing," the party must produce the "original writing." FRE 1002. This rule applies where "the witness's testimony concerning these facts is based on the writing's contents, not on knowledge independent of those contents." 31 Charles A. Wright & Victor J. Gold, FEDERAL PRACTICE & PROCEDURE § 7184, p. 381 (2000). This rule would be applicable if Thomas testified that she concluded Wilken had forged documents by reviewing specific documents containing such forgeries or by reading it in a document purported to convey such information.

However, this is not Thomas's testimony. Rather, Thomas testified as to conduct, namely that she personally observed Wilken engaging in the acts of forging. This is a fact of

which she has independent personal knowledge regardless of the existence of a writing. Using this testimony, Cascadia seeks to prove that Wilken engaged in the activity of forging company documents. Cascadia is not attempting to prove the contents of a writing but the conduct of one of its employees. On the latter point, Thomas's testimony of personally observing Wilken engage in what she believes was forgery is both competent (based upon personal knowledge, FRE 602) and relevant (tends to show that Wilken forged company documents, FRE 403).

Wilken's citation to *Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F3d 924 (9th Cir 2002), *amended and superseded*, *Los Angeles News Service v. CBS Broadcasting, Inc.*, 313 F3d 1093 (9th Cir 2002), does not support her position. In *Los Angeles News Service*, CBS objected to the submission of a declaration given by a witness for the plaintiff, Los Angeles News Service ["LANS"], in support of its motion for partial summary judgment. The witness's testimony concerned a label on a the box holding a beta-tape which indicated that the source of the tape was a video news service company (apparently owned by CBS) that LANS asserted had distributed LANS copyrighted work without authorization. The district court excluded the evidence on the basis that it was hearsay. On review, the Ninth Circuit affirmed the district court's ruling, not on the basis of the hearsay rule, but because the proffered evidence violated the best evidence rule.

Although the Ninth Circuit provided no analysis, its holding easily fits within the principles outlined above. The witness for LANS was testifying to facts (the source of the video tape) learned from a writing's content, and not to facts based on knowledge that existed independently of the contents of a writing. That is, using the witness's testimony, LANS was attempting to prove the contents of a writing (that the label said what the witness testified it

said), thereby identifying the source of the video. Aside from reading the writing on the label, the witness had no independent knowledge of the source of the video. Under those circumstances the court held that "LANS was required to produce the original label . . .or at least explain why it could not do so." *Id* at 935-6 (citations omitted).

Thomas did not testify that she saw documents which she believed were forged or that she learned of Wilken's alleged forgery from a document, but testified that she personally observed Wilken forging documents. Therefore, her testimony is not barred by the best evidence rule because it is not attempting to prove the contents of a writing.

Wilken next argues that the absence of a forged document renders Thomas's testimony "conclusory" or "mere speculation." Testimony is "conclusory" when a witness "[e]xpress[es] a factual inference without stating the underlying facts on which the inference is based." BLACK'S LAW DICTIONARY, 308 (8th ed 2004). In this case, Thomas testified about observed conduct. That she may be mistaken as to what she thinks she saw, or even lying, is an appropriate subject for cross examination, but her testimony is not conclusory. Furthermore, Thomas is not speculating by "theorizing about matters over which there is no certain knowledge." *Id* at 1435 (defining "speculation"). She does not offer theories, but recounts events as she remembers them.

Neither is Cascadia's response to Wilken's Request for Production No. 52 an admission that Thomas's testimony is speculative. Cascadia objected because the request itself is "speculative," given that "it has not yet been established which, if any, documents plaintiff forged." Brischetto Aff, Exhibit B, p. 1. Thomas's testimony and Cascadia's response are not inconsistent. Thomas testified that she observed Wilken forge signatures on documents. Based

on this testimony, Wilken surmises that Cascadia has some forged documents in its possession. Cascadia's response does not challenge Thomas's testimony, but rather Wilken's request. Cascadia never outright denies the existence of such documents since immediately after its objection, it states: "Subject to these objections, defendant will produce any documents on which it believes plaintiff forged client signatures." The use of the word "speculative" by Cascadia refers only to Wilken's request, not the piece of evidence on which the request is based.

Thomas's testimony would indeed be bolstered by the production of documents allegedly forged by Wilken. However, the absence of such documents does not render inadmissible Thomas's testimony about her personal observations of Wilken's behavior. *See, R&R Assocs., Inc. v. Visual Scene, Inc.*, 726 F2d 36, 38 (1st Cir 1984) ("No evidentiary rule . . . prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation."). Finally, the level of detail provided by Thomas in her testimony goes only to the weight of her testimony and not its admissibility. Thomas's testimony regarding Wilken's alleged forgeries is sufficient evidence, when viewed in the light most favorable to Cascadia, to permit a reasonable jury to find that Wilken engaged in misconduct.

### 2.      Termination of Wilken for Alleged Misconduct

Cascadia also must prove by a preponderance of the evidence that it would have fired Wilken for the misconduct alleged. *O'Day*, 79 F3d at 761. The burden on Cascadia is not insignificant. "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such a severity that the employee would have been terminated *on those grounds alone* if the employer had known of it at the time of the discharge." *McKennon*, 513 US at 362-63 (emphasis added). "This inquiry," the Ninth Circuit

has emphasized, "focuses on the employer's *actual employment practices*, *not just standards established in its employee manuals*, and reflects a recognition that employers often *say* they will discharge employees for certain misconduct while *in practice* they do not." *O'Day*, 79 F3d at 759 (emphasis added).

At this juncture, Cascadia need only present enough evidence to create a genuine issue of material fact from which a reasonable jury could find that it has met this burden. Cascadia again offers a single piece of evidence, namely excerpts from the Manual which Wilken received and reviewed.

Wilken contends that the language in the Manual by itself is insufficient to support Cascadia's burden. She argues that in order to satisfy its burden, Cascadia also must provide evidence that it has fired other employees under similar circumstances. Cascadia admits that it has never terminated another employee for conduct similar to that alleged in its Fourteenth Affirmative Defense, but only because it is unaware that any other employees engaged in such conduct. Instead it claims, citing *O'Day*, that it need only show that "it has a policy that could plausibly be read to require termination for such conduct."

*O'Day* does not support Cascadia's argument. In that case, O'Day returned to work in the evening after his employer denied him a promotion and rummaged through his supervisor's desk. In a closed drawer he found notes and memoranda which had been marked "personal/sensitive" concerning "sensitive personnel matters." He photocopied the documents, removed them from the office, and showed them to another employee who was going to be laid off. His employer did not learn of the misconduct until after discovery began on O'Day's ADEA claim. Once the employer learned of O'Day's behavior, it filed summary judgment and

succeeded in having the entire case dismissed on the grounds of the after-acquired evidence doctrine.[3] O'Day admitted the wrongdoing and offered no evidence to refute the employer's argument that it would have fired him immediately upon its discovery of the misconduct. Among the issues before the court was whether, in light of this admitted wrongdoing, the employer met its burden of proving that it would have terminated O'Day had it learned of the wrongdoing at the time it occurred.

On this point, the employer offered two primary pieces of evidence: (1) an affidavit from a human resources representative who testified that, "had [the employer] been aware of Mr. O'Day's conduct before his layoff, he would have been immediately terminated;" (2) and a company policy which dictated that O'Day's conduct would "normally result in discharge unless extenuating circumstances are present." *Id* at 761. O'Day challenged the affidavit as "self-serving" and "speculative." The court agreed that O'Day had a point, but stated that the testimony was not incompetent just because it could be impeached. The court found that the employer was "entitled to rely on sworn affidavits from its employees in proving that it would have discharged O'Day for the alleged misconduct." *Id* at 762. The court went on to say:

> We could hardly require employers in these cases to come forward with proof that they discharged other employees for the precise misconduct at issue (though such evidence would no doubt be helpful to their case) as often the only proof an employer will have is that adduced in this case - a company policy forbidding the conduct and the testimony of a company official that the conduct would have resulted in immediate discharge.

*Id.*

---

[3] The Ninth Circuit overturned the remedy portion of the district court's decision in keeping with the Supreme Court's holding in *McKennon* that the after-acquired evidence doctrine does not bar all relief. *O'Day*, 79 F3d at 764.

The court cautioned that an employer could not prevail "only on bald assertions" but found the employer had met its burden that because the testimony was corroborated both by a company policy ("which plausibly could be read to require discharge for the conduct at issue here") and by "common sense" (given the egregious nature of the conduct it could not be seriously doubted that the employer would have immediately terminated O'Day). *Id* at 762-64.

Contrary to Wilken's position, *O'Day* rejected the argument that the employer must demonstrate that it has terminated someone for the exact same conduct in the past. However, *O'Day* cannot be read to support Cascadia's position that the combination of some evidence of wrongdoing and a company policy that could "plausibly be read to require discharge" is sufficient to meet the employer's burden at summary judgment. Rather, the court held that in light of the complete absence of evidence to the contrary, summary judgment for the employer was justified by the combination of the admitted wrongdoing, the testimony from the company representative, the employer's policies, and common sense.

Here Wilken denies any wrongdoing and disputes that Cascadia would have fired her based on the accusation of a single employee. Wilken testifies that other Cascadia employees have engaged in similar conduct to that alleged by Thomas without resulting in immediate termination. Wilken Reply Decl, ¶¶ 10-11. Wilken's testimony is corroborated by the testimony of her immediate supervisor Garvey that an issue of "falsification" of the dates on some of the tenant files in the McCarthy project arose during the August 2005 recertification. Garvey Depo, pp. 113-19. Garvey discussed potential sanctions with other supervisors for this conduct that did not include the option of immediate termination. *Id* at 182. Though it does not appear that the conduct in the two cases was identical, "falsification" is close enough to "forgery" to cast doubt

on Cascadia's claims that it would have immediately terminated Wilken upon discovery of her actions.

Moreover, Cascadia has not provided an affidavit from a Cascadia manager that it would have fired Wilken on the testimony of Thomas alone and in the absence of documented proof. In this respect it has failed to proffer even the minimal showing made by the defendant in *O'Day*.

The differing procedural posture faced in *O'Day* makes reliance on that case somewhat problematic. In *O'Day*, the court was reviewing the grant of summary judgment for the employer where the employee had presented no evidence to contradict the employer's evidence. Thus, *O'Day* examined whether the evidence presented by the employer was sufficient as a matter of law to meet the employer's burden of proof on its after-acquired evidence defense. Here the employee has moved for summary judgment. Therefore, this court's task is to determine whether Cascadia has presented enough evidence to create a genuine issue of fact from which a reasonable jury could conclude that it meets its burden on the after-acquired evidence doctrine, not, as in *O'Day*, whether this evidence meets that burden.

Nevertheless, even viewing the evidence in the light most favorable to Cascadia, it is apparent it has failed to create a genuine issue of material fact on the second element of the after-acquired evidence doctrine. While it has offered language from the Manual that could plausibly be read to require Wilken's termination, the language is hortatory, not mandatory ("Termination should be expected . . ."). Beyond the Manual, Cascadia has offered nothing else. The Ninth Circuit expressly stated in *O'Day* that the language in an employment manual is insufficient to support an after-acquired evidence defense. Even if the jury ignored the evidence offered by Wilken, and fully credited the testimony of Thomas, it could not, as a matter of law, find for

Cascadia based solely on the language of the Manual.[4]  Cascadia is required to produce some evidence that its practice is to terminate employees under similar circumstances, and has failed to do so.  Because, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 US 574, 587 (1986) (citation and internal quotation marks omitted).

**3.     Conclusion**

Cascadia has failed to raise a genuine issue of material fact that it would have immediately terminated Wilken based upon the wrongdoing reported by Thomas.  Therefore, Wilken's motion for partial summary judgment on Cascadia's Fourteenth Affirmative Defense should be granted.

**II.     Discovery Sanction**

Wilken also argues that this court should exercise its broad discretion under FRCP 37(b)(2) to strike the Fourteenth Affirmative Defense because Cascadia failed to produce documents containing the alleged forgeries by Wilken.  This court does not consider Cascadia's search through a sample of less than 10% of the relevant files over a period of only two days as complying with this court's Order (docket # 63).  However, because the Fourteenth Affirmative Defense should be stricken for another reason, this court need not and does not express any opinion on the propriety of striking the Fourteenth Affirmative Defense as a discovery sanction.

///

---

[4]  In its briefing, Cascadia intimates that the bonuses received by Wilken for meeting deadlines in the recertification process could have provided a motive for Wilken's forgery.  However, the record shows that Wilken only received a bonus for meeting deadlines at the initial "lease up" of a new tax credit eligible building project.  There is no evidence that she received one for her performance in the recertification process.  Wilken Depo, pp. 38-39; Garvey Decl (docket # 76), ¶ 6; Lively Decl, Exhibit 7.

**RECOMMENDATION**

Based on the foregoing, Wilken's Partial Motion for Summary Judgment (docket # 128) should be GRANTED as to the Fourteenth Affirmative Defense, based on a lack of sufficient evidence.

**SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due November 19, 2007. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 31st day of October, 2007.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge