**Stephen L. Brischetto**, OSB No. 78156
Attorney at Law
slb@brischettolaw.com
806 SW Broadway, Suite 400
Portland, Oregon 97205
TELEPHONE: (503) 223-5814
FAX: (503) 228-1317

Michael R. Seidl, OSB No. 83319
mseidl@landye-bennett.com
LANDYE BENNETT BLUMSTEIN LLP
1300 SW Fifth Ave., Suite 3500
Portland, Oregon 97201
TELEPHONE: (503) 224-4100
FAX: (503) 224-4133

     Of Attorneys for Plaintiff Janette M. Wilken

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

JANETTE M. WILKEN, an individual,       Case No. CV 06 195 ST

          Plaintiff,

                              **PLAINTIFF'S MOTIONS *IN LIMINE***

     vs.

                                **ORAL ARGUMENT REQUESTED**

CASCADIA BEHAVIORAL
HEALTHCARE, INC., an Oregon non-
profit corporation,
               Defendant.

     Plaintiff moves the court *in limine* as follows:

     1. Precluding defendant from offering any evidence on defendant's affirmative

defenses to the Seventh Claim for Relief for regular and overtime wages.

     2. Precluding defendant from offering any evidence related to plaintiff's alleged

sexual contact unknown to defendant prior to termination and not in the presence of others.

**Page 1 - PLAINTIFF'S MOTIONS *IN LIMINE***

Mot.Limine.doc

STEPHEN L. BRISCHETTO
ATTORNEY AT LAW
806 S.W. Broadway, Suite 400
Portland, Oregon 97205
Telephone: (503) 223-5814

1.    **This Court Should Preclude Defendant From Offering Evidence Supporting Affirmative Defenses In The Pre-Trial Order To Plaintiff's Wage And Overtime Claims**

In the Pre-Trial Order, defendant alleged the following contentions in response to plaintiff's Seventh Claim for Relief for regular and overtime wages:

> "Some or all of plaintiff's claims are barred by the doctrines of wavier (sic), estoppel, ratification, acquiescence, accord and satisfaction, settlement, consent, agreement, payment and release."

Pre-Trial Order at 12.

These contentions are apparently supported by contentions that plaintiff knowingly and/or voluntarily submitted to any alleged wage violation and knowingly failed to notify Cascadia that she was engaging in overtime work. Pre-Trial Order at 12.

Defendant should be precluded from offering evidence relating to these three contentions for two reasons. First, the parties litigated summary judgment motions as to plaintiff's wage and hour claims. This court has already established that defendant is liable to plaintiff for wage and overtime violations. In Magistrate Stewart's Findings and Recommendations she granted plaintiff's motion for summary judgment establishing "Cascadia's violation of ORS 653.261 and the Fair Labor Standards Act ("FLSA"), 29 USC § 207, by failing to pay Wilken regular and overtime wages for the period she was misclassified as exempt from February 9, 2004, to June 30, 2005..." Findings and Recommendations at 62 (August 10, 2007).

The only remaining issues on the wage and overtime claims are: the amount of wages due plaintiff and whether defendant is liable for liquidated damages, interest and penalties. Findings and Recommendations at 62-63. Defendant filed no objections to Magistrate

**Page 2  -  PLAINTIFF'S MOTIONS IN LIMINE**

Mot.Limine.doc

*STEPHEN L. BRISCHETTO*
*ATTORNEY AT LAW*
*806 S.W. Broadway, Suite 400*
*Portland, Oregon 97205*
*Telephone:  (503) 223-5814*

Stewart's Findings and Recommendations. Subsequently, the court accepted Magistrate

Stewart's Findings and Recommendations. Opinion and Order (October 5, 2007).

If defendant had legal authority to support any of the 9 affirmative defenses to

liability on the wage and overtime claims (and if defendant had evidence to support such

defenses to liability) it should have been raised in response to plaintiff's motion for summary

judgment and as an objection to Magistrate Stewart's recommendation of a finding of liability.

Defendant did not offer any evidence or argument supporting any of these claimed affirmative

defenses to liability in response to plaintiff's motion. As a result, all of these affirmative

defenses to the wage and overtime claims have been waived. Defendant's liability for violation

of wage and overtime laws is the law of the case.

Second, seven of the 9 affirmative defenses defendant placed in the Pre-Trial

Order: ratification, acquiescence, accord and satisfaction, consent, settlement, agreement,

payment and release were not pleaded in either defendant's Answer to the complaint or Answer

to the amended complaint.[1] These affirmative defenses are barred because defendant failed to

raise them in defendant's responsive pleading. See, FRCP 8(c)(1)(requiring party to

affirmatively state in response to a pleading any avoidance or affirmative defense including

accord and satisfaction, laches, payment, and release). Every defense to a claim for relief must

be asserted in the responsive pleading if one is required other than those defenses set forth in

FRCP 12(b).

///

---

[1] Defenses of waiver and estoppel are raised in both of defendant's responsive pleadings. See,
Defendant's Eleventh Affirmative Defense.

**Page 3 - PLAINTIFF'S MOTIONS *IN LIMINE***

Mot.Limine.doc

STEPHEN L. BRISCHETTO
ATTORNEY AT LAW
806 S.W. Broadway, Suite 400
Portland, Oregon 97205
Telephone: (503) 223-5814

Plaintiff does not consent to trying these new affirmative defenses which were not properly alleged as a part of defendant's Answer to the Complaint and the Amended Complaint.

This case was filed in February 2006. Defendant filed its Answer in April 2006. Plaintiff filed her Amended Complaint in January 2007. Defendant filed its Answer and Affirmative Defenses to the Amended Complaint in January 2007. Each party filed summary judgment motions in March 2006 which were decided in October 2007. As a result of plaintiff's Motion for Summary Judgment, plaintiff obtained partial summary judgment against defendant on wage and overtime claims. Plaintiff filed a second Motion for Summary Judgment in August 2007. Plaintiff's second Motion for Summary Judgment sought, and obtained, summary judgment against the affirmative defense of after acquired evidence of misconduct which defendant raised in defendant's Answer to the Amended Complaint. Plaintiff's second Motion for Summary Judgment was resolved in January 2008.

Plaintiff will be prejudiced by allowing these defenses to be added at this late stage of the case. The parties completed discovery and litigated three summary judgment motions prior to defendant's raising these affirmative defenses as a part of the pre-trial order. Plaintiff would be deprived of discovery and the opportunity to file motions for summary judgment (or compelled to further delay trial to seek discovery and litigate additional summary judgment motions), if these new affirmative defenses are permitted. Both options subject plaintiff to undue prejudice. Furthermore, defendant never attempted to raise these affirmative defenses in a procedurally proper manner by seeking leave to file an amended answer. Rather, defendant sought to raise these new affirmative defenses without seeking leave from the court.

Mot.Limine.doc

STEPHEN L. BRISCHETTO
ATTORNEY AT LAW
806 S.W. Broadway, Suite 400
Portland, Oregon 97205
Telephone: (503) 223-5814

Since these affirmative defenses were not timely raised and since adding them at this late date
subjects plaintiff to undue prejudice, defendant should be precluded from offering evidence to
support the new defenses.

Because plaintiff sought and obtained summary judgment establishing
defendant's liability for wage and overtime violations and defendant offered no legal authority or
evidence to support an affirmative defense to liability and because all but two of the claimed
affirmative defense were not asserted in responsive pleadings or in a motion to amend, defendant
should be precluded *in limine* from offering evidence to support the three contentions.

## 2. Precluding Defendant From Offering Alleged Evidence Of Sexual Contact Unknown Prior To Discharge And Outside The Presence Of Others

In defendant's Motion for Summary Judgment defendant sought to offer
deposition testimony relating to alleged sexual contact between Ms. Wilken and Ms. Padilla at
the workplace but not in the presence of others. Excerpts of the challenged deposition testimony
are attached to this Memorandum. There are two instances of such contact which defendant
sought to offer in litigating the summary judgment motions..

First, there was testimony in depositions that plaintiff and Ms. Padilla kissed on
one occasion while alone in a locked bathroom on the premises at Cascadia in approximately
January 2005. Wilken Dep 234, lines 20-22; 235, lines 1-13; Padilla Dep 47, lines 19-25; 48,
lines 1-6.

Second, defendant offered deposition testimony and excerpts of a personal
notebook the two women maintained of a second incident that occurred on the premises late after
normal work hours ended between Ms. Wilken and Ms. Padilla in approximately May 2005.

**Page 5  -  PLAINTIFF'S MOTIONS *IN LIMINE***

Mot.Limine.doc

*STEPHEN L. BRISCHETTO*
*ATTORNEY AT LAW*
*806 S.W. Broadway, Suite 400*
*Portland, Oregon 97205*
*Telephone: (503) 223-5814*

With respect to the second incident, there was testimony in deposition that late after normal work hours while alone at work, the two women were making fun of the rules being imposed on them by their supervisors. Ms. Wilken sat on a desk to see if she could hide in a 3 inch space, Ms. Padilla walked towards her and spread her legs out exposing her clothed genital area and at that point the women decided they needed to take this home. Padilla Dep 65-66. Wilken Dep 260-261. Ms. Wilken testified that its possible that she may have touched Ms. Paddilla between her legs outside her clothing. Wilken Dep 261, lines 15-16.

With respect to both instances, the testimony and documents supporting each of the incidents should be excluded because both instances are irrelevant under FRE 401, because any marginal relevance of the evidence is outweighed by the prejudicial effect of both instances under FRE 403, because both instances are character evidence offered to show action in conformity therewith under FRE 404(b), because both instances are specific acts of conduct offered to attack the witness' character for truthfulness under FRE 608 and because defendant will be unable to satisfy its burden to show admissibility of such evidence under FRE 412.

Under FRE 401, the evidence is irrelevant to any issue in the case. With respect to plaintiff's claims of retaliation and discrimination, the portions of these claims that remain after summary judgment relate only to the adverse employment decision of plaintiff's termination in November 2005. See, Pre-Trial Order, Claims One through Four. On these termination claims, defendant "contends that plaintiff was terminated for taking home tax credit files." Pre-Trial Order, at 3. All of plaintiff's claims asserting that she was subjected to harassment or intentional infliction of emotional distress have been dismissed on defendant's motion for summary judgment. See, Findings and Recommendations at 63 (August 10, 2007)

## Page 6 - PLAINTIFF'S MOTIONS IN LIMINE

Mot.Limine.doc

STEPHEN L. BRISCHETTO
ATTORNEY AT LAW
806 S.W. Broadway, Suite 400
Portland, Oregon 97205
Telephone: (503) 223-5814

(recommending dismissal of hostile workplace claims and intentional infliction claims). Furthermore, the court ruled found that any different treatment of plaintiff by defendant, other than plaintiff's discharge, was not sufficiently severe to constitute an adverse employment decision. See, Findings and Recommendations at 44 (stating any claimed different treatment was not sufficiently severe to be an adverse employment decision).

Thus, the disputed factual issues on plaintiff's claims of retaliation and discrimination are whether plaintiff and Ms. Padilla made complaints of discrimination and whether defendant terminated plaintiff because of her complaints of discrimination, because of her lesbian relationship with Ms. Padilla or because took home tax credit files.

Neither of the incidents of alleged sexual contact has any tendency to prove whether defendant terminated plaintiff because she took her tax credit files. Because both of the incidents of claimed sexual contact were unknown to defendant prior to plaintiff's termination and because neither incident occurred in the presence of any other person, neither incident has any bearing on the factual issues in the case. The Ninth Circuit has held that "information about [plaintiff] which was unknown to [defendant] at the time the decision was made could not have entered into the calculus of the decision and would be entirely irrelevant. *Norris v City and County of San Franciso*, 900 F2d 1326, 1331 (9th Cir 1990). Thus, evidence of the two incidents is irrelevant to any issue in the case.

Neither of the incidents is relevant to any issue of after acquired evidence of misconduct. Defendant asserted an affirmative defense of after acquired evidence of misconduct unrelated to any allegations that there was sexual contact between the two women in these two incidents. However, the court granted plaintiff's second motion for summary judgment against

**Page 7 - PLAINTIFF'S MOTIONS *IN LIMINE***

Mot.Limine.doc

*STEPHEN L. BRISCHETTO*
*ATTORNEY AT LAW*
*806 S.W. Broadway, Suite 400*
*Portland, Oregon 97205*
*Telephone: (503) 223-5814*

the after acquired evidence of misconduct claim. Thus, there is no affirmative defense in the case related to after acquired evidence.

Second, under FRE 412, if defendant attempts to offer evidence of sexual behavior or sexual predisposition to establish sexual misconduct, such evidence is subject to the more stringent rules of admissibility under FRE 412. FRE 412 switches the burden of showing admissibility to the party offering the evidence rather than to the party seeking to exclude the evidence. Additionally, FRE 412 raises the threshold for admissibility of the evidence by requiring the proponent to show that the probative value of the evidence substantially outweighs the specified dangers of the evidence. *BKB v Maui Police Dept.*, 276 F3d 1091, 1104 (9th Cir 2002).

These two incidents occurred either in a private setting or at a time when others were not present (in a locked bathroom and late in the evening after normal work hours). Thus, they have no bearing on what the women would do during work hours in the presence of others. The two incidents were remote in time from the termination occurring between six and ten months prior to termination. Further, the disputed issues in the case focus on whether defendant discriminated against plaintiff by terminating her employment for taking home tax credit files not on issues as to whether defendant terminated or disciplined plaintiff for inappropriate contact with her partner in the workplace.

Under FRE 403, if these two incidents have any marginal relevance, the relevance is outweighed by the unfairly prejudicial effect of the evidence. Defendant's arguments and evidence relating to both incidents are highly inflammatory and have the potential to unfairly prejudice a jury against plaintiff when weighed against any marginal relevance of the

**Page 8 - PLAINTIFF'S MOTIONS IN LIMINE**

Mot.Limine.doc

evidence. There may be jurors who would be prejudiced against the plaintiff by hearing arguments focusing on descriptions of alleged sexual contact between two women. There may be jurors who believe that evidence of claimed misconduct unknown at the time of termination should influence the decision. There may be jurors who apply prejudices relating to such evidence in awarding the amount of damages. Thus, the evidence suggests an improper basis for a jury decision.

Finally, under FRE 404(b) and 608 the evidence is evidence of other wrongs offered to prove that plaintiff acted in conformity therewith on other occasions or the evidence is an attempt to attack plaintiff's character for truthfulness through specific incidents of conduct. Defendant will argue that if plaintiff engaged in some form of inappropriate contact in the workplace on these two occasions this evidence is relevant to show that plaintiff and Ms. Padilla engaged in different kinds of inappropriate contact in front of others in the workplace. Under FRE 404(b) and 608 this evidence is not admissible for such a purpose.

This court should preclude defendant from offering alleged evidence of sexual contact unknown prior to discharge or occurring outside the presence of others.

### *SUMMARY*

For the reasons set forth above, this court should grant both of plaintiff's motions *in limine*.

DATED this 9th day of June, 2008.

_____
**STEPHEN L. BRISCHETTO**
OSB # 78156
(503) 223-5814
Attorney for Plaintiff

Mot.Limine.doc

*STEPHEN L. BRISCHETTO*
*ATTORNEY AT LAW*
*806 S.W. Broadway, Suite 400*
*Portland, Oregon 97205*
*Telephone: (503) 223-5814*

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3

4   JANETTE M. WILKEN, an                )
    individual,                          )
5                                        )
             Plaintiff,                  )
6                                        )
    v.                                   )  No. 06195 ST
7                                        )
    CASCADIA BEHAVIORAL                  )
8   HEALTHCARE, INC., an Oregon          )
    non-profit corporation,             )   **Certified Copy**
9                                        )
             Defendant.                  )
10                                       )

11

12

13

14

15      VIDEOTAPED DEPOSITION OF BEVERLY PADILLA

16                    VOLUME I

17            (Pages 1 through 153)

18        Taken on behalf of the Defendant

19              February 27, 2007

20

21      MOORE HENDERSON ALLEN & THOMAS
        Professional Court Reporting & Videography

22

23   101 SW Main Street, Suite 280 • Portland, OR 97204     503.226.3313 • 1.800.962.7308 • Fax 503.273.0109

24

25

EXHIBIT A, P. 149

13:32:31   1        Q.   That's what I'm asking.

13:32:34   2        A.   No.

13:32:36   3        Q.   Did you have any personal relationships

13:32:37   4   with anyone else at Cascadia since the time that you

13:32:41   5   worked for the company?

13:32:42   6        A.   No.   It better be no.

13:32:48   7             MR. LIVELY:   Can we take a break?

13:32:49   8             (Pause in deposition:   1:33 - 1:41 p.m.)

13:41:23   9

13:41:25  10   BY MR. LIVELY:   (Continuing)

13:41:46  11        Q.   Okay.   Before we left off, Ms. Padilla, we

:  )1:52  12   talked about the fact that you hadn't been in any

13:41:56  13   other intimate relationships with an employee of

13:41:59  14   Cascadia.

13:42:00  15             In your relationship with Ms. Wilken

13:42:04  16   during the time she was employed with Cascadia, did

13:42:06  17   you ever kiss Ms. Wilken on Cascadia's work

13:42:12  18   premises, meaning in the administration building?

13:42:16  19        A.   There might have been an occasion in the

13:42:24  20   admin building in a locked bathroom.

13:42:28  21        Q.   When was that?

13:42:33  22        A.   That was before we were actually a couple,

13:42:37  23   so it was before February of '05.   I don't know -- I

1ɔ:42:47  24   don't remember the day or the time or the month, but

13:42:49  25   it was before we were a couple.

| | | |
|---|---|---|
| 13:42:52 | 1 | Q.   Did that -- |
| 13:42:54 | 2 | A.   It wasn't a -- |
| 13:42:54 | 3 | Q.   I'm sorry. |
| 13:42:57 | 4 | A.   It was just a kiss on the cheek. |
| 13:42:58 | 5 | Q.   Just a kiss on the cheek? |
| 13:43:00 | 6 | A.   Yeah. |
| 13:43:05 | 7 | Q.   Why were you kiss -- having a kiss on the |
| 13:43:10 | 8 | cheek in the bathroom? |
| 13:43:12 | 9 | A.   We had been trying to make plans to get |
| 13:43:15 | 10 | together to go out for coffee, and because of her |
| 13:43:20 | 11 | schedule, she was often out of the building, because |
| 13:43:23 | 12 | of various things in the billing department, I was |
| 13:43:29 | 13 | busy as well, so we made some time after work to |
| 13:43:34 | 14 | meet in the bathroom which was on the other side of |
| 13:43:37 | 15 | the admin building that had a lock on it, and we met |
| 13:43:41 | 16 | in there to talk about making plans for getting |
| 13:43:44 | 17 | together for coffee. |
| 13:43:46 | 18 | Q.   Why did you feel that you needed to meet |
| 13:43:48 | 19 | in a locked bathroom to make plans to have coffee? |
| 13:43:53 | 20 | A.   It was a private conversation. |
| 13:43:58 | 21 | Q.   Other than a kiss on the cheek during the |
| 13:44:03 | 22 | incident in the bathroom -- |
| 13:44:07 | 23 | A.   Excuse me, can someone turn off that |
| 13:44:09 | 24 | heater.  It's really hot in here. |
| 13:44:12 | 25 | Thank you.  Thanks. |

EXHIBIT $A$, P. 3 of 9

| | | |
|---|---|---|
| 13:57:08 | 1 | A.   When our attorney showed it to us.   I |
| 13:57:11 | 2 | don't know when that was. |
| 13:57:13 | 3 | Q.   Well, I don't want you to talk to me about |
| 13:57:14 | 4 | what your attorney did. |
| 13:57:16 | 5 | I'm wondering if prior to the deposition, |
| 13:57:21 | 6 | if you've ever seen the notebook that Exhb. 68 came |
| 13:57:28 | 7 | out of. |
| 13:57:29 | 8 | A.   Of course I have. |
| 13:57:30 | 9 | Q.   That's what I'm trying to figure out. |
| 13:57:32 | 10 | When I say "a copy of 68," I mean if you've ever |
| 13:57:37 | 11 | seen what's written in Exhb. 68 before. |
| 57:40 | 12 | A.   Yes. |
| 13:57:40 | 13 | Q.   Okay.   Is this part of the notebook that |
| 13:57:42 | 14 | you talked about that you purchased so that you and |
| 13:57:45 | 15 | Ms. Wilken could write back and forth to each other? |
| 13:57:48 | 16 | A.   It looks like it. |
| 13:57:50 | 17 | Q.   Okay.   And where was the notebook kept? |
| 13:57:55 | 18 | A.   With us. |
| 13:57:55 | 19 | Q.   Either one of you? |
| 13:57:57 | 20 | A.   Yes. |
| 13:57:59 | 21 | Q.   And does that mean it occasionally |
| 13:58:02 | 22 | traveled to work? |
| 13:58:03 | 23 | A.   It might have been in the Titan. |
| 1:58:11 | 24 | Q.   Did you ever write notes to Ms. Wilken in |
| 13:58:16 | 25 | that -- in the notebook while you were at the |

MOORE  HENDERSON & THOMAS  (503) 226-3313

EXHIBIT ____ , P.____

| | | |
|---|---|---|
| 14:05:07 | 1 | employee appreciation picnic, but the rest of the |
| 14:05:12 | 2 | time, she would continue harassing both of us and I |
| 14:05:21 | 3 | didn't want to go and I made that clear to her. |
| 14:05:24 | 4 | Q.   Was the picnic something that all your |
| 14:05:27 | 5 | coworkers in the billing department were invited to? |
| 14:05:31 | 6 | A.   Yes. |
| 14:05:31 | 7 | Q.   As well as you? |
| 14:05:32 | 8 | A.   Yes. |
| 14:05:32 | 9 | Q.   Did you attend the picnic? |
| 14:05:34 | 10 | A.   Absolutely not. |
| 14:05:39 | 11 | Q.   Are you aware of whether any of your other |
| :  )5:42 | 12 | coworkers in the billing department failed to attend |
| 14:05:46 | 13 | the picnic? |
| 14:05:47 | 14 | A.   I don't know. |
| 14:05:55 | 15 | Q.   Ms. Padilla, I'd like you to look at |
| 14:05:58 | 16 | what's been marked as Exhb. 72.  Once you're |
| 14:06:01 | 17 | finished reading it, please let me know. |
| 14:06:33 | 18 | A.   Okay. |
| 14:06:33 | 19 | Q.   Prior to today, have you seen Exhb. 72 as |
| 14:06:38 | 20 | part of a notebook? |
| 14:06:40 | 21 | A.   Yes. |
| 14:06:41 | 22 | Q.   And do you recall whether you received it |
| 14:06:43 | 23 | on or around 6-21 of '05, or 5-21 of '05? |
| 1.:06:51 | 24 | A.   I think it's May. |
| 14:06:58 | 25 | Q.   5-21 of '05? |

EXHIBIT _A_, P.5 of 9

| | | |
|---|---|---|
| 14:06:58 | 1 | A.    I think so. |
| 14:06:58 | 2 | Q.    And was it your understanding that the |
| 14:06:59 | 3 | contents of Exhb. 72 was addressed to you? |
| 14:07:01 | 4 | A.    Yes. |
| 14:07:01 | 5 | Q.    And do you recognize Exhb. 72 as being |
| 14:07:05 | 6 | Ms. Wilken's handwriting? |
| 14:07:08 | 7 | A.    Yes. |
| 14:07:08 | 8 | Q.    And do you recall the event that is |
| 14:07:12 | 9 | referenced on the first page of Exhb. 72? |
| 14:07:16 | 10 | A.    Yes. |
| 14:07:16 | 11 | Q.    What do you recall about that? |
| )7:17 | 12 | A.    It was a night that Janette was working |
| 14:07:22 | 13 | late on some files that she needed to get done and |
| 14:07:28 | 14 | she was in the housing department, and since I |
| 14:07:31 | 15 | wasn't allowed to be in there, I was in the billing |
| 14:07:34 | 16 | department just -- I don't remember what I was |
| 14:07:38 | 17 | doing, just killing time. |
| 14:07:43 | 18 | Q.    Do you recall anything else about that? |
| 14:07:53 | 19 | How did you prove that it's possible to hide in |
| 14:07:55 | 20 | three inches of wall space? |
| 14:07:58 | 21 | A.    When Janette was done for the evening, it |
| 14:08:01 | 22 | was pretty late, so she came over to the billing |
| 14:08:04 | 23 | department to get me to go home, and this hiding in |
| 14:08:12 | 24 | three inches of wall space, we were making fun of |
| 14:08:16 | 25 | the rule that Audrey had instituted that Janette |

EXHIBIT $\underline{A}$, P6 of 2

| | | |
|---|---|---|
| 14:08:20 | 1 | couldn't come into my cubicle and lean against my |
| 14:08:24 | 2 | desk, because people might think that she was |
| 14:08:27 | 3 | hiding, and if she were seen as hiding in my |
| 14:08:31 | 4 | cubicle, people might think that we were doing |
| 14:08:34 | 5 | something, so we were trying to see if it was, in |
| 14:08:37 | 6 | fact, possible to hide. |
| 14:08:39 | 7 | I had measured the part of the wall that |
| 14:08:42 | 8 | Audrey claimed that Janette could hide behind and it |
| 14:08:47 | 9 | measured out to be three inches, so neither one of |
| 14:08:50 | 10 | us being small people, we were going to see if, in |
| 14:08:54 | 11 | fact, it was possible to hide in three inches of |
| 8:57 | 12 | wall space, so I was sitting on the -- in the corner |
| 14:09:01 | 13 | of my cubicle -- it's not a desk so much as a space |
| 14:09:08 | 14 | that wraps around, and where it wraps around on the |
| 14:09:11 | 15 | left side, there was the three inches of wall |
| 14:09:13 | 16 | hanging out, so I was sitting in that area trying to |
| 14:09:16 | 17 | see if I could hide, and low and behold, it wasn't |
| 14:09:20 | 18 | possible for either one of us to do that. |
| 14:09:29 | 19 | Q.    What is the reference to your pearl being |
| 14:09:32 | 20 | exposed? |
| 14:09:38 | 21 | A.    Well, I think what she might have been |
| 14:09:41 | 22 | talking about there was that in the position that I |
| 14:09:44 | 23 | was on the desk, she walked towards me and spread my |
| 14:09:54 | 24 | legs out with her hands and, you know, it was late, |
| 14:10:02 | 25 | we were tired, we both wanted to go home, and at |

| | | |
|---|---|---|
| 14:10:05 | 1 | that point, I just said, "We need to take this |
| 14:10:09 | 2 | home." |
| 14:10:11 | 3 | Q.    When you say "We need to take this home," |
| 14:10:14 | 4 | what does that mean? |
| 14:10:16 | 5 | A.    Well, I picked up from Janette that she |
| 14:10:21 | 6 | was maybe in a romantic mood.  I wasn't going to do |
| 14:10:29 | 7 | anything.  We weren't going to do anything there at |
| 14:10:32 | 8 | work and we didn't.  We -- she basically just put |
| 14:10:37 | 9 | her hands on my knees, spread my legs apart.   I |
| 14:10:41 | 10 | don't remember if she -- she might have run her hand |
| 14:10:45 | 11 | down the inside of my leg or something, I don't |
| :  )0:48 | 12 | remember what happened after that, but I remember I |
| 14:10:50 | 13 | grabbed her hand and said, "Let's go home." |
| 14:10:55 | 14 | Q.    Was Ms. Wilken pressed up against you at |
| 14:10:59 | 15 | that time? |
| 14:11:00 | 16 | A.    I don't remember.  She might have been. |
| 14:11:08 | 17 | Q.    Do you recall whether Ms. Wilken during |
| 14:11:10 | 18 | this incident touched you in the genital area? |
| 14:11:18 | 19 | A.    It's possible that her hand might have |
| 14:11:20 | 20 | gone down that far.  Like I said, I think she ran |
| 14:11:24 | 21 | her hand down the inside of my thigh.  She might |
| 14:11:28 | 22 | have reached that area, but that's as far as it |
| 1⁴:11:31 | 23 | went.  Both of us were fully clothed. |
| 1⁴:11:49 | 24 | Q.    Okay.  You can set that aside. |
| 14:11:55 | 25 | And Ms. Padilla, I'd like you to look at |

EXHIBIT _A_, P._8_ o/_9_

1   STATE OF OREGON        )

2   County of Multnomah )          **Certified Copy**

3

4           I, Aaron M. Thomas, Certified Shorthand

5   Reporter, Registered Professional Reporter, and

6   Notary Public for the State of Oregon, do hereby

7   certify that BEVERLY PADILLA personally appeared

8   before me at the time and place mentioned in the

9   caption herein; that the witness was by me first

10  duly sworn on oath and examined upon oral

11  interrogatories propounded by counsel; that said

12  examination, together with the testimony of said

13  witness, was taken down by me in stenotype and

14  transcribed through computer-aided transcription;

15  and that the foregoing transcript constitutes a

16  full, true and accurate record of said examination

17  of and testimony given by said witness, and of all

18  other oral proceedings had during the taking of said

19  deposition, and of the whole thereof.

20          Witness my hand and Notarial Seal at

21  Portland, Oregon, this 5th day of March, 2007.

22

23

24                                  _____
                                    Aaron M. Thomas
25                                  Oregon CSR 04-0388



MOORE HENDERSON & THOMAS (503) 226-331 **EXHIBIT** A , P. 9 of 9

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3

4    JANETTE M. WILKEN, an                  )
     individual,                           )
5                                          )
              Plaintiff,                   )
6                                          )
     v.                                    )  No. 06195 ST
7                                          )
     CASCADIA BEHAVIORAL                   )
8    HEALTHCARE, INC., an Oregon           )
     non-profit corporation,              )  **Certified Copy**
9                                          )
              Defendant.                   )
10                                         )

11

12

13

14

15        VIDEOTAPED DEPOSITION OF JANETTE M. WILKEN

16                      VOLUME II

17             (Pages 215 through 289)

18          Taken on behalf of the Defendant

19                 February 27, 2007

20                MOORE HENDERSON ALLEN & THOMAS
                  Professional Court Reporting & Videography
21

22
     101 SW Main Street, Suite 280 • Portland, OR 97204          503.226.3313 • 1.800.962.7308 • Fax 503.273.0109
23

24

25

EXHIBIT B, P. 1 of 16

| | | |
|---|---|---|
| 10:00:35 | 1 | Q. And do you know where you were when you |
| 10:00:37 | 2 | gave Exhb. 68 to Ms. Padilla? |
| 10:00:40 | 3 | A. I don't recall. |
| 10:00:41 | 4 | Q. And were the statements made in Exhb. 68 |
| 10:00:46 | 5 | accurate at the time that you made them? |
| 10:00:50 | 6 | A. Yes. |
| 10:00:54 | 7 | Q. Now, I will submit to you that based on |
| 10:00:55 | 8 | the information that we received regarding this |
| 10:01:00 | 9 | note, it looks like there's notes from you and from |
| 10:01:03 | 10 | Ms. Padilla, I don't know if they're going back and |
| 10:01:06 | 11 | forth, but in your hand and I'm assuming in your |
| 10:01:09 | 12 | hand. |
| 10:01:09 | 13 | Was -- the notebook that contained -- it |
| 10:01:12 | 14 | looks like a spiral notebook that contained |
| 10:01:14 | 15 | Exhb. 68, was that something you and Ms. Padilla |
| 10:01:23 | 16 | shared? |
| 10:01:23 | 17 | A. Yes. |
| 10:01:23 | 18 | Q. Would it be something, for lack of a |
| 10:01:23 | 19 | better word, that was passed back and forth between |
| 10:01:27 | 20 | you and Ms. Padilla? |
| 10:01:29 | 21 | A. Yes. |
| 10:01:30 | 22 | Q. And was that generally passed back and |
| 10:01:31 | 23 | forth at work? |
| 10:01:32 | 24 | A. No. |
| 10:01:33 | 25 | Q. Where would the notebook be passed back |

EXHIBIT B, P. 2 of 16

| | | |
|---|---|---|
| 10:01:35 | 1 | and forth? |
| 10:01:36 | 2 | A.   At any time. |
| 10:01:37 | 3 | Q.   Was it something that one of you carried |
| 10:01:39 | 4 | with you? |
| 10:01:41 | 5 | A.   One or the other. |
| 10:01:43 | 6 | Q.   Okay.  I'm just trying to understand if |
| 10:01:45 | 7 | Exhb. 68 was a notebook that was kept at work or |
| 10:01:48 | 8 | carried with somebody or how that -- how that went. |
| 10:01:57 | 9 | A.   I don't understand your question. |
| 10:01:58 | 10 | Q.   Sure. |
| 10:01:59 | 11 | It looks like Exhb. 68 is part of a spiral |
| 02:02 | 12 | notebook, and what I'm wondering is was that spiral |
| 10:02:05 | 13 | notebook something that either you or Ms. Padilla |
| 10:02:10 | 14 | kept on yourselves at all times and traveled with |
| 10:02:13 | 15 | one of you, or was it something that was left in a |
| 10:02:16 | 16 | drawer at work or something other than one of those |
| 10:02:20 | 17 | two? |
| 10:02:21 | 18 | A.   It was -- it traveled with us.  We would |
| 10:02:24 | 19 | take it wherever we went, whether that be to work or |
| 10:02:28 | 20 | to the beach. |
| 10:02:29 | 21 | Q.   Okay.  So it might have gone to work, but |
| 10:02:33 | 22 | it might have -- Exhb. 68 might have gone to work or |
| 10:02:36 | 23 | it might have gone other places as well? |
| 10:02:38 | 24 | A.   Yes. |
| 10:02:38 | 25 | Q.   The binder, I should say, the notebook. |

EXHIBIT B , P. 3 of 16

| | | |
|---|---|---|
| 10:04:16 | 1 | mean anything to you? |
| 10:04:17 | 2 | A.    No. |
| 10:04:20 | 3 | Q.    So why did you write it? |
| 10:04:21 | 4 | MR. BRISCHETTO:  Objection; asked and |
| 10:04:22 | 5 | answered. |
| 10:04:23 | 6 | Go ahead. |
| 10:04:24 | 7 | A.    This is a personal diary, what's written |
| 10:04:28 | 8 | in it is -- part of it is to console each other.  I |
| 10:04:39 | 9 | don't want her to feel bad about something or to |
| 10:04:41 | 10 | take it on and have to, you know, be angry about |
| 10:04:47 | 11 | something, so in a sense, I'm trying to console so |
| 04:54 | 12 | that she doesn't feel so bad. |
| 10:04:56 | 13 | Q.    And the "she" is Ms. Padilla? |
| 10:05:00 | 14 | A.    Ms. Padilla, yes. |
| 10:05:05 | 15 | Q.    So let me make sure that I understand |
| 10:05:07 | 16 | this. |
| 10:05:07 | 17 | Even though you didn't necessarily agree |
| 10:05:10 | 18 | personally with the statement that in the grand |
| 10:05:13 | 19 | scheme of things, this didn't mean anything to you, |
| 10:05:15 | 20 | you were writing that in your diary to essentially |
| 10:05:18 | 21 | help Ms. Padilla feel better about the situation? |
| 10:05:22 | 22 | MR. BRISCHETTO:  Objection; asked and |
| 10:05:23 | 23 | answered; inaccurate summary of the testimony. |
| 10:05:26 | 24 | Go ahead. |
| 10:05:29 | 25 | A.    The thing that was important was us and |

EXHIBIT B. P.416

| | | |
|---|---|---|
| 10:14:43 | 1 | to the time Exhb. 69 was created? |
| 10:14:52 | 2 | A.  I -- I don't recall. |
| 10:14:54 | 3 | Q.  And had you held hands in the building at |
| 10:14:58 | 4 | the time -- prior to the time Exhb. 69 was created? |
| 10:15:02 | 5 | A.  I don't recall. |
| 10:15:04 | 6 | Q.  And had you otherwise touched each other, |
| 10:15:07 | 7 | you and Ms. Padilla, in the building prior to the |
| 10:15:10 | 8 | time Exhb. 69 was created? |
| 10:15:12 | 9 | A.  I don't recall. |
| 10:15:16 | 10 | Q.  Do you recall if you kissed Ms. Padilla in |
| 10:15:20 | 11 | the building at any time after Exhb. 69 was created? |
| 15:24 | 12 | A.  I don't recall. |
| 10:15:26 | 13 | Q.  Do you recall if you kissed Ms. Padilla in |
| 10:15:29 | 14 | the building at any time while you were employed at |
| 10:15:32 | 15 | Cascadia? |
| 10:15:40 | 16 | A.  Possibly. |
| 10:15:41 | 17 | Q.  And -- |
| 10:15:44 | 18 | A.  I believe on one occasion. |
| 10:15:45 | 19 | Q.  And do you know when that was? |
| 10:15:51 | 20 | A.  I believe it was in the bathroom on the |
| 10:15:55 | 21 | other side of the building before we were together |
| 10:15:59 | 22 | as a couple. |
| 10:16:02 | 23 | Q.  What does "in the bathroom on the other |
| 10:16:05 | 24 | side of the building" mean? |
| 10:16:07 | 25 | A.  There was a private bathroom that had a |

EXHIBIT B , P.5 of 16

| | | |
|---|---|---|
| 10:16:09 | 1 | lock on it, so if you -- and it was over on the |
| 10:16:12 | 2 | accounting side of the building, so for whatever |
| 10:16:15 | 3 | reason -- |
| 10:16:18 | 4 | Q. And you stated this was before you were |
| 10:16:21 | 5 | together as a couple. |
| 10:16:23 | 6 | My understanding is that you became a |
| 10:16:24 | 7 | couple sometime in February of 2005. |
| 10:16:28 | 8 | Is that accurate? |
| 10:16:28 | 9 | A. Yes. |
| 10:16:31 | 10 | Q. So could this have been January of 2005 |
| 10:16:34 | 11 | that the kissing in the bathroom occurred, or could |
| 16:39 | 12 | it have been prior to that? |
| 10:16:40 | 13 | A. Probably. |
| 10:16:44 | 14 | Q. Was it likely that the kissing in the |
| 10:16:46 | 15 | bathroom occurred sometime between December of 2004 |
| 10:16:49 | 16 | and February of 2005? |
| 10:16:51 | 17 | A. Yes. |
| 10:16:57 | 18 | Q. And did anything happen in the bathroom |
| 10:16:59 | 19 | other than a kiss? |
| 10:17:01 | 20 | A. A hug. |
| 10:17:05 | 21 | Q. Anything other than a kiss and a hug? |
| 10:17:08 | 22 | A. We had a conversation about meeting at a |
| 17:09 | 23 | coffee shop after work. |
| 10:17:12 | 24 | Q. But no other physical contact other than a |
| 10:17:15 | 25 | kiss -- |

EXHIBIT B . P. 69/16

| | | | |
|---|---|---|---|
| 10:17:15 | 1 | A. | No. |
| 10:17:16 | 2 | Q. | -- and a hug? |
| 10:17:17 | 3 | | Is that a "no"? |
| 10:17:23 | 4 | A. | "No." |
| 10:17:25 | 5 | Q. | And do you recall holding hands at any |

10:17:27   6   times on Cascadia work premises with Ms. Padilla

10:17:32   7   while you worked for Cascadia?

10:17:35   8      A.   I don't recall.

10:17:35   9      Q.   You just don't recall one way or the other

10:17:37   10   or you don't think it happened?

10:17:39   11      MR. BRISCHETTO:   Objection; calls for

:  17:40   12   speculation.

10:17:40   13      Go ahead.

10:17:42   14      A.   I don't recall.

10:17:42   15      Q.   And do you recall touching Ms. Padilla in

10:17:46   16   any way other than what you've already described in

10:17:49   17   the bathroom at any time during the period that you

10:17:52   18   were employed by Cascadia?

10:17:55   19      A.   Yes.

10:17:57   20      Q.   Tell me about that, what do you recall?

10:17:59   21      A.   There was an evening that I worked late.

10:18:03   22   It was prior to July 1st of '05, because that was

10:18:10   23   when I changed from a salaried employee to an hourly

10:18:15   24   employee, so I was still hourly, but not -- no, I

10:18:20   25   was still salary, excuse me, not getting paid for

| | | |
|---|---|---|
| 10:18:24 | 1 | overtime, but I was there late, it was 9:15, 9:30; |
| 10:18:29 | 2 | somewhere in there. |
| 10:18:31 | 3 | Ms. Padilla was in her department at her |
| 10:18:36 | 4 | cubicle reading a book waiting for me.  I was in the |
| 10:18:40 | 5 | housing department working, and when I got done, I |
| 10:18:45 | 6 | walked over to billing and knocked on the door and |
| 10:18:50 | 7 | she answered the door and I said, "Let's go," and |
| 10:18:54 | 8 | she responded in a way that was, you know, "About |
| 10:19:01 | 9 | time," you know, and I felt bad that she had to wait |
| 10:19:05 | 10 | so long for me. |
| 10:19:18 | 11 | I went back over to her cubicle to gather |
| 19:21 | 12 | up her things.  I'm not -- I'm not recalling what |
| 10:19:29 | 13 | led up to it, but she had leaned up against her desk |
| 10:19:34 | 14 | and we were joking with each other about her hiding |
| 10:19:38 | 15 | behind the three inches of wall that they accused us |
| 10:19:43 | 16 | of hiding behind, and so we were making fun of their |
| 10:19:56 | 17 | rules and so she scooted up on to the desk trying to |
| 10:20:04 | 18 | hide and I came in close to her and I spread her |
| 10:20:07 | 19 | legs apart and, you know, tried to hide in that |
| 10:20:13 | 20 | three inches of wall with her. |
| 10:20:23 | 21 | Q.   Did anything else happen other than you |
| 10:20:27 | 22 | spreading her legs apart and trying to hide in that |
| 10:20:31 | 23 | incident? |
| 10:20:32 | 24 | A.   I don't recall anything else except that |
| 10:20:36 | 25 | it was time to go home and she looked at me and |

| | | |
|---|---|---|
| 10:20:39 | 1 | said, "Let's go home." |
| 10:20:41 | 2 | Q.   Was any part of Ms. Padilla's body exposed |
| 10:20:47 | 3 | during that incident? |
| 10:20:48 | 4 | A.   No. |
| 10:20:50 | 5 | Q.   Were any part of her clothes removed |
| 10:20:52 | 6 | during that incident? |
| 10:20:53 | 7 | A.   No. |
| 10:21:02 | 8 | Q.   Other than the bathroom hug and this |
| 10:21:04 | 9 | incident that you've just described, and did you say |
| 10:21:06 | 10 | that was in your office or her office? |
| 10:21:09 | 11 | A.   Hers. |
| :  21:12 | 12 | Q.   Any other touching that you and |
| 10:21:15 | 13 | Ms. Padilla engaged in on the work premises during |
| 10:21:24 | 14 | the time that you were employed by Cascadia? |
| 10:21:27 | 15 | A.   I recall one other time when I was at my |
| 10:21:32 | 16 | desk, she came over to talk about -- she made a |
| 10:21:39 | 17 | doctor's appointment for me, I think, and she had |
| 10:21:41 | 18 | her hand on my knee.  She was knelt down, you know, |
| 10:21:48 | 19 | next to me and had her hand on my knee so that we |
| 10:21:52 | 20 | could have a private -- you know, a quick, private |
| 10:21:55 | 21 | conversation about the doctor's appointment that she |
| 10:21:57 | 22 | made for me. |
| 10:21:58 | 23 | Q.   During that incident, was any part of your |
| 10:22:01 | 24 | or Ms. Padilla's private body parts exposed? |
| 10:22:07 | 25 | A.   No. |

EXHIBIT  B , P.9 of 16

| | | |
|---|---|---|
| 10:22:10 | 1 | Q. And were either your or Ms. Padilla's |
| 10:22:15 | 2 | clothes removed during that incident? |
| 10:22:17 | 3 | A. No. |
| 10:22:19 | 4 | Q. Other than the bathroom incident that |
| 10:22:21 | 5 | we've discussed, the incident in her office and this |
| 10:22:27 | 6 | one that you've just related to me with her hand on |
| 10:22:30 | 7 | your knee, any other instances of you and |
| 10:22:33 | 8 | Ms. Padilla touching each other in the workplace |
| 10:22:38 | 9 | while you were employed by Cascadia? |
| 10:22:40 | 10 | A. Not that I recall. |
| 10:22:41 | 11 | Q. Why did you create Exhb. 69? |
| :  23:19 | 12 | A. I don't know that I can answer that. I -- |
| 10:23:22 | 13 | it was a brief communication with Bev. |
| 10:23:40 | 14 | Q. You actually just answered my next |
| 10:23:42 | 15 | question. |
| 10:23:43 | 16 | Who was Exhb. 69 written to? |
| 10:23:45 | 17 | A. Bev. |
| 10:23:46 | 18 | Q. Bev Padilla? |
| 10:23:48 | 19 | A. Yes. |
| 10:23:48 | 20 | Q. And did you, in fact, give Exhb. 69 to Bev |
| 10:23:52 | 21 | Padilla while you were employed by Cascadia? |
| 10:23:55 | 22 | A. Yes. |
| 10:23:55 | 23 | Q. And do you know where you were when you |
| 10:23:57 | 24 | drafted Exhb. 69? |
| 10:23:58 | 25 | A. No. |

```
10:43:50   1            Ms. Wilken, the court reporter has handed
10:43:52   2    you what's been marked as Exhb. 72.  I would like
10:43:55   3    you to read it over and let me know when you're
10:44:01   4    finished.
10:44:37   5        A.    Okay.
10:44:39   6        Q.    And is the handwriting on Exhb. 72 your
10:44:43   7    handwriting?
10:44:44   8        A.    Yes.
10:44:46   9        Q.    And the date on the top right, it appears
10:44:50  10    to be 6-21-05, but I can't tell if it's 6-21-05 or
10:44:57  11    5-21-05.
:  4:59  12            Can you tell which date it is?
10:45:02  13        A.    I believe it's 6-21-05.
10:45:05  14        Q.    And did you create Exhb. 72 on or near
10:45:10  15    6-21-05?
10:45:13  16        A.    Probably.
10:45:13  17        Q.    Do you have any reason to doubt that you
10:45:15  18    created Exhb. 72 at a time other than on or around
10:45:19  19    6-21-05?
10:45:22  20        A.    No.
10:45:23  21        Q.    And where were you when you wrote
10:45:26  22    Exhb. 72?
10:45:33  23        A.    I don't recall.
10:45:36  24        Q.    And the reference in Exhb. 72 says, "Oh,
10:45:42  25    Babe."
```

EXHIBIT B , P.11 of 16

| | | |
|---|---|---|
| 10:45:43 | 1 | Is that in reference to Ms. Padilla? |
| 10:45:45 | 2 | A.   Yes. |
| 10:45:46 | 3 | Q.   And did you, in fact, give Ms. Padilla a |
| 10:45:50 | 4 | copy of Exhb. 72? |
| 10:45:52 | 5 | A.   Yes. |
| 10:45:52 | 6 | Q.   And do you know where you were when you |
| 10:45:54 | 7 | gave Ms. Padilla a copy of Exhb. 72? |
| 10:45:58 | 8 | A.   No. |
| 10:46:00 | 9 | Q.   Could you have been at work? |
| 10:46:02 | 10 | A.   Yes. |
| 10:46:03 | 11 | Q.   And at the time you wrote Exhb. 72, were |
| 16:12 | 12 | the statements made in that exhibit accurate to the |
| 10:46:15 | 13 | best of your knowledge? |
| 10:46:24 | 14 | A.   Accurate within the context, yes. |
| 10:46:30 | 15 | Q.   What does that mean, "Accurate within the |
| 10:46:33 | 16 | context"? |
| 10:46:38 | 17 | A.   Meaning if someone unrelated would read |
| 10:46:41 | 18 | this, it can sound like something that it may not |
| 10:46:48 | 19 | have been between the two of us. |
| 10:46:50 | 20 | Q.   Why did you write Exhb. 72? |
| 10:46:58 | 21 | A.   The notebook were personal thoughts |
| 10:47:01 | 22 | between Ms. Padilla and myself.  We would write what |
| 10:47:09 | 23 | we wanted to write. |
| 10:47:12 | 24 | Q.   Were you describing an event that had |
| 10:47:17 | 25 | occurred in Exhb. 72? |

MOORE HENDERSON & THOMAS (503) 226-3315 **EXHIBIT** B, P.12 of 16

| | | |
|---|---|---|
| 10:51:07 | 1 | That being said, "work" based on what else |
| 10:51:12 | 2 | is said here was -- again, making reference to their |
| 10:51:21 | 3 | ridiculous rules and assumptions about what we did, |
| 10:51:27 | 4 | you know, behind closed doors or when nobody else |
| 10:51:31 | 5 | was there. |
| 10:51:33 | 6 | Q. So it's your testimony under oath that |
| 10:51:38 | 7 | your use of the term "work" with quotes around it |
| 10:51:45 | 8 | isn't referring to you and Ms. Padilla engaging in |
| 10:51:49 | 9 | conduct at the workplace other than work? |
| 10:51:51 | 10 | A. No. |
| 10:51:55 | 11 | Q. Explain that to me. Actually, move to |
| 1  51:57 | 12 | strike. |
| 10:51:58 | 13 | Are you by using the term "work" with |
| 10:52:00 | 14 | quotes referring to conduct that you and Ms. Padilla |
| 10:52:04 | 15 | engaged in at the workplace other than work? |
| 10:52:07 | 16 | A. No. |
| 10:52:21 | 17 | Q. The next sentence states, "I think we've |
| 10:52:25 | 18 | proved that" -- excuse me, let me strike that and |
| 10:52:28 | 19 | restart. |
| 10:52:29 | 20 | "I think we proved that it is possible to |
| 10:52:32 | 21 | hide in three inches of wall space. You were very |
| 10:52:37 | 22 | well tucked in that three inches with your 'pearl' |
| 1  52:41 | 23 | exposed." |
| 10:52:46 | 24 | What does the reference that "it is |
| 10:52:48 | 25 | possible to hide in three inches of wall space" |

| | | |
|---|---|---|
| 10:52:53 | 1 | refer to? |
| 10:52:53 | 2 | A.   Again, we were making fun of the rules |
| 10:52:56 | 3 | that they had made.  I had come over after I was |
| 10:53:00 | 4 | done doing my work to tell her it was time to go. |
| 10:53:04 | 5 | When she leaned up against the table, we were |
| 10:53:07 | 6 | talking about hiding behind the three inches of |
| 10:53:10 | 7 | wall. |
| 10:53:13 | 8 |   You know, we -- she -- she sat on her desk |
| 10:53:18 | 9 | and I took her legs and moved them apart and got in |
| 10:53:21 | 10 | very close to see if we could hide.  We were making |
| 10:53:24 | 11 | fun of their rules.  I was making fun of their |
| 53:27 | 12 | rules. |
| 10:53:27 | 13 | Q.   And were you able to hide behind the three |
| 10:53:32 | 14 | inches of wall space in the manner you've just |
| 10:53:36 | 15 | described? |
| 10:53:36 | 16 | A.   No.  It was sarcastic. |
| 10:53:42 | 17 | Q.   So it's your testimony under oath that by |
| 10:53:45 | 18 | stating "I think we proved that it is possible to |
| 10:53:49 | 19 | hide in three inches of wall space," that you were |
| 10:53:56 | 20 | actually stating the opposite? |
| 10:53:59 | 21 | A.   It was sarcastic. |
| 10:54:08 | 22 | Q.   What is the reference to your quote -- her |
| 10:54:13 | 23 | "pearl" being exposed, what is that regarding? |
| 10:54:23 | 24 | A.   A pearl in this case is referring to her |
| 10:54:30 | 25 | genital area.  By exposing it, I was -- again, it |

| | | |
|---|---|---|
| 10:54:36 | 1 | was sarcastic, but in the sense that I spread her |
| 10:54:40 | 2 | legs to expose. |
| 10:54:45 | 3 | Q.    Okay.  Is the pearl a reference to a |
| 10:54:49 | 4 | clitoris? |
| 10:54:51 | 5 | A.    Yes. |
| 10:54:52 | 6 | Q.    And so your reference there was -- sorry, |
| 10:54:55 | 7 | strike that. |
| 10:54:56 | 8 | So it's your testimony that using the term |
| 10:54:59 | 9 | "pearl exposed" meant with her clothing on, but |
| 10:55:05 | 10 | spreading her legs? |
| 10:55:06 | 11 | A.    That's how I meant it, yes. |
| 55:09 | 12 | Q.    The next sentence states, "And oh how I |
| 10:55:13 | 13 | enjoy rolling your 'pearl' around." |
| 10:55:23 | 14 | What is that in reference to? |
| 10:55:27 | 15 | A.    I don't recall that, but I'm guessing that |
| 10:55:31 | 16 | I reached down, and on top of her clothing, fondled |
| 10:55:40 | 17 | her. |
| 10:55:42 | 18 | Q.    And then the last -- and again, "pearl" is |
| 10:55:47 | 19 | in reference to a clitoris in that sentence? |
| 10:55:50 | 20 | A.    Yes. |
| 10:55:50 | 21 | Q.    The next sentence states, "Maybe next time |
| 10:55:55 | 22 | you can sit in your chair." |
| 10:55:58 | 23 | What is that in reference to? |
| 10:56:17 | 24 | A.    Just that maybe next time, instead of |
| 10:56:19 | 25 | trying to hide behind three inches of wall, that |

1    STATE OF OREGON        )

2    County of Multnomah )        **Certified Copy**

3

4         I, Aaron M. Thomas, Certified Shorthand

5    Reporter, Registered Professional Reporter, and

6    Notary Public for the State of Oregon, do hereby

7    certify that JANETTE M. WILKEN personally appeared

8    before me at the time and place mentioned in the

9    caption herein; that the witness was by me first

10   duly sworn on oath and examined upon oral

11   interrogatories propounded by counsel; that said

12   examination, together with the testimony of said

13   witness, was taken down by me in stenotype and

14   transcribed through computer-aided transcription;

15   and that the foregoing transcript constitutes a

16   full, true and accurate record of said examination

17   of and testimony given by said witness, and of all

18   other oral proceedings had during the taking of said

19   deposition, and of the whole thereof.

20        Witness my hand and Notarial Seal at

21   Portland, Oregon, this 7th day of March, 2007.

22

23

24                              Aaron M. Thomas

25                              Oregon CSR 04-0388

MOORE HENDERSON & THOMAS (503) 226-3315 EXHIBIT B, P. 16 of 16

## CERTIFICATE OF SERVICE

I hereby certify I served the foregoing **PLAINTIFF'S MOTIONS *IN LIMINE*** on:

David G. Hosenpud
Leah C. Lively
Attorney at Law
**LANE POWELL, PC**
601 SW Second Ave., Ste 2100
Portland OR 97204-3158

      Of Attorneys for Defendant

    ___   HAND DELIVERY
    ___   U.S. MAIL
    ___   FAX
    ___   E-Mail
   _X_   ECF

Michael R. Seidl
Seidl Law Offices PC
806 SW Broadway, Suite 400
Portland OR 97205
      Of Attorneys for Plaintiff

    ____   HAND DELIVERY
    ____   U.S. MAIL
    ____   FAX
    ____   E-Mail
   _X_   ECF

by delivering this date to said attorney(s) a true copy thereof as stated above. I further certify that said documents were contained in sealed envelopes, addressed as above stated, to the last-known addresses of said attorney(s). Documents delivered by mail were deposited in the post office at Portland, Oregon with postage thereon prepaid.

    DATED:      June 9, 2008

                       Stephen L. Brischetto
                       OSB 78156
                       (503) 223-5814
                       Attorney for Plaintiff

**Page 10 - PLAINTIFF'S MOTIONS IN LIMINE**

Mot.Limine.doc

*STEPHEN L. BRISCHETTO*
*ATTORNEY AT LAW*
*806 S.W. Broadway, Suite 400*
*Portland, Oregon 97205*
*Telephone: (503) 223-5814*